## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE THOMAS J. AQUILINO, JR., JUDGE

_____

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED, | ) ) |
| Defendant-Intervenor, | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, et al., | ) ) ) |
| Defendant-Intervenors, | ) ) |

Consol. Court No. 23-00202
PUBLIC VERSION
 Confidential Info in [    ]

_____ )

## DEFENDANT'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy

Assistant Attorney General

PATRICIA McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

RUSLAN KLAFEHN                    KARA M. WESTERCAMP
Attorney                         Trial Attorney
Office of Chief Counsel          Commercial Litigation Branch
For Trade Enforcement & Compliance   Civil Division
U.S. Department of Commerce      U.S. Department of Justice
                                 P.O. Box 480
                                 Ben Franklin Station
                                 Washington, D.C. 20044
                                 Tel: (202) 305-7571
                                 Email: Kara.M.Westercamp@usdoj.gov

Dated: April 16, 2024            *Attorneys for Defendant*

# TABLE OF CONTENTS

**PAGES**

DEFENDANT'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD ..................................................................................1

RULE 56.2 STATEMENT ........................................................................2

    I.    The Administrative Determination Under Review ........................2

    II.    Issues Presented For Review ........................................................3

STATEMENT OF FACTS .........................................................................3

    I.    Initiation Of Review And Selection Of Mandatory Respondents ..............3

    II.    Preliminary Results ......................................................................4

    III.    Administrative Case Briefs ..........................................................7

    IV.    Final Results ................................................................................9

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT ...........................................................................................11

    I.    Legal Standards ...........................................................................11

        A.    Standard Of Review ....................................................11

        B.    Normal Value Calculation Legal Framework ...............12

    II.    Substantial Evidence Supports Commerce's Determination To Rely On All Of Megaa Moda's Reported Home Market Sales For The Calculation Of Normal Value ..................................................13

        A.    Commerce Reasonably Declined To Impute Knowledge To Megaa Moda Regarding Its Home Market Sales .........................14

            1.    The Record Evidence Demonstrated That [ ███████ ███████ ] Were Not Applicable To Domestic Sales Of Unbranded Shrimp Such That Imputing Knowledge To Megaa Moda That Its Sales Were Meant For Export To The U.S. Would Be Unreasonable ....................................15

2.    Because [ █████████████████████████████
██████████████ ] The Fact That [ ████████████
██████████ Was Not Sufficient To Impute Knowledge To
Megaa Moda That Its Sales To [ ██████ ] Were Meant For
Export To The U.S. ........................................................16

3.    Given [ ████████████████████████████ ], The Volume
Sold To [ ████████ ] Was Not Aberrational Such That It
Would Be Improper To Impute Knowledge To Megaa Moda
That Its Sales Were Meant For Export To The U.S. ..........16

4.    Given That Megaa Moda Made Sales To The U.S. Of Both
[ ████████ ] and [ ████████████████ ] Shrimp,
Imputing Knowledge To Megaa Moda That Its Sales Were
Meant For Export To The U.S. Would Be Unreasonable ..17

5.    Imputing Knowledge To Megaa Moda's U.S. Sales Of [ ██████
██████ ] Shrimp Would Be Unreasonable ..........................19

6.    The Use Of A [ ████████████ ] With The Word [
████████████ ] Was Insufficient To Impute Knowledge To
Megaa Moda That Its Sales Were Meant For Export To The
U.S When The Facilitated Sales Were Made To An Indian
Company At An Indian Address ........................................20

B.    Record Evidence Demonstrates That Commerce Considered
AHSTAC's Additional Arguments And Reasonably Concluded
These Arguments Lacked Merit....................................................21

III.    Substantial Evidence Supports Commerce's Determination To Deny
Megaa Moda's Requested Short Term Interest Income Offsets ................25

A.    Substantial Evidence Supports Commerce's Determination To
Exclude The Portion Of The Interest Income Offset Related To
The Interest Subvention Program From The Calculation Of
Megaa Moda's Financial Expense Ratio .....................................26

B.    Substantial Evidence Supports Commerce's Determination To
Exclude The Portion Of The Interest Income Offset Related To
Interest On "FD with FBL"...........................................................31

IV.    Substantial Evidence Supports Commerce's Calculation Of The Rate
For Companies Not Selected For Individual Review ...............................33

CONCLUSION...............................................................................................33

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGES**

*Allegheny Ludlum Corp. v. United States,*
    215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) .......................................................... 13

*Apex Exps. v. United States,*
    37 C.I.T. 1823 (Ct. Int'l Trade 2013) ...................................................................... 29

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017) ................................................................................. 18

*Cinsa, S.A. de C.V. v. United States,*
    966 F. Supp. 1230 (Ct. Int'l Trade 1997) ............................................................... 27

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) ........................................................................ 12, 23

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ......................................................................................... 12, 23

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007) ............................................................................... 18

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ................................................................................. 11

*Gov't of Argentina v. United States,*
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ..................................................... 21, 25

*Hyundai Elecs. Indus. Co., Ltd. v. United States,*
    342 F. Supp. 2d 1141 (Ct. Int'l Trade 2004) .......................................................... 27

*INA Walzlager Schaeffler KG v. United States,*
    957 F. Supp. 251 (Ct. Int'l. Trade 1997) ................................................................ 13

*Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. v. United States,*
    651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023) ..................................................... 27, 31

*Ningbo Dafa Chem. Fiber Co. v. United States,*
    580 F.3d 1247 (Fed. Cir. 2009) ............................................................................... 11

*NSK Ltd. v. Koyo Seiko Co.,*
    190 F.3d 1321 (Fed. Cir. 1999) ............................................................................... 12

*NTN Bearing Corp. of America v. United States,*
    905 F. Supp. 1083 (Ct. Int'l Trade 1995) ............................................................... 27

*OTR Wheel Eng'g, Inc. v. United States,*
   901 F.Supp.2d 1375 (Ct. Int'l Trade 2013) ........................................................ 14, 19

*Pakfood Pub. Co. Ltd. v. United States,*
   453 F. App'x 986 (Fed. Cir. 2011) ........................................................................ 27

*Pakfood Pub. Co. Ltd. v. United States,*
   724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ........................................................ 27

*QVD Food Co., Ltd. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011) ............................................................................ 31

*Stupp Corp. v. United States,*
   359 F. Supp. 3d 1293 (Ct. Int'l. Trade 2019) ........................................................ 13

*U.S. Steel Corp. v. United States,*
   621 F.3d 1351 (Fed. Cir. 2010) ............................................................................ 12

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) ............................................................................................ 11

*Yue Pak, Ltd. v. United States ITA,*
   20 C.I.T. 495 (1996) ............................................................................................ 13

*Yue Pak, Ltd. v. United States ITA,*
   111 F.3d 142 (Fed. Cir. 1997) .............................................................................. 13

*Z.A. Sea Foods Priv. Ltd. v. United States,*
   569 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) ........................................................ 16

## STATUTES

19 U.S.C. § 1561a(b)(1)(B) .................................................................................... 11

19 U.S.C. § 1677(35)(A) ......................................................................................... 12

19 U.S.C. § 1677b(a) .............................................................................................. 33

19 U.S.C. § 1673 ..................................................................................................... 12

28 U.S.C. § 2637(d) ................................................................................................ 18

## REGULATIONS

19 C.F.R.. § 351.309(c)(2) ...................................................................................... 18

## ADMINISTRATIVE DETERMINATIONS

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,*
    68 Fed. Reg. 23,954 (Dep't of Commerce May 6, 2003) .......................... 12

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,*
    63 Fed. Reg. 55,361 (Dep't of Commerce October 15, 1998).................... 12

*Certain Frozen Warmwater Shrimp From India,*
    88 Fed. Reg. 60,431 (Dep't of Commerce Sept. 1, 2023) ................. 2, 9, 10

*Certain Frozen Warmwater Shrimp From India,*
    88 Fed. Reg. 13,430 (Dep't of Commerce Mar. 3, 2023)......................... 3, 6

*Certain Frozen Warmwater Shrimp from Thailand,*
    74 Fed. Reg. 47,551 (Dep't of Commerce Sept. 16, 2009) ....................... 27

*Certain Lined Paper Products from India,*
    88 Fed. Reg. 21,971 (Dep't of Commerce Apr. 12, 2023) .......................... 9

*Glycine from India,*
    84 Fed. Reg. 18,487 (Dep't of Commerce May 1, 2019) .......................... 12

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    87 Fed. Reg. 21,619 (Dep't of Commerce Apr. 12, 2022) .......................... 3

*Live Swine From Canada,*
    70 Fed. Reg. 12,181 (Dep't of Commerce Mar. 11, 2005)........................ 26

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE THOMAS J. AQUILINO, JR., JUDGE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED | ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED, | ) ) |
| Defendant-Intervenor, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, et al., | ) ) ) |
| Defendant-Intervenors. | ) ) |

Consol. Court No. 23-00202
PUBLIC VERSION
Confidential Info in [  ]

## DEFENDANT'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully responds to the motions for judgment on the administrative record filed by plaintiff, Ad Hoc Shrimp Trade Action Committee (AHSTAC), and plaintiff-intervenor, American Shrimp Processors Association (ASPA), ECF No. 40, and plaintiff Megaa Moda Private Limited (Megaa Moda), ECF No. 38.  AHSTAC, ASPA, and Megaa Moda challenge the final results of the U.S. Department of Commerce's (Commerce) seventeenth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from India.  AHSTAC and ASPA dispute Commerce's determination to exclude certain of Megaa Moda's home market sales from the calculation of normal value and the calculation of the rate applied to non-selected entities.  Megaa Moda disputes Commerce's determination to deny certain interest income offsets.  As explained below, the motions should be denied because Commerce's final results are supported by substantial evidence and are otherwise in accordance with law.[1]

<u>RULE 56.2 STATEMENT</u>

I.        <u>The Administrative Determination Under Review</u>

This action challenges Commerce's final results of the seventeenth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from India.  *See Certain Frozen Warmwater Shrimp From India*, 88 Fed. Reg. 60,431 (Dep't of Commerce Sept. 1, 2023) (final results) (P.R. 205), and the accompanying Issues and Decision Memorandum (Dep't of Commerce Aug. 25, 2023) (IDM) (P.R. 202).  The period of review is February 1, 2021, through January 31, 2022.

---

[1]  AHSTAC and ASPA submitted a joint motion for judgment on the agency record, thus references to AHSTAC also include ASPA.

II.   Issues Presented For Review

1.   Whether Commerce's determination to rely on all of Megaa Moda's reported home market sales is supported by substantial evidence.

2.   Whether Commerce's determination to deny two of Megaa Moda's requested interest income offsets is supported by substantial evidence.

3.   Whether Commerce's determination of the margin assigned to non-selected companies under review is supported by substantial evidence.

STATEMENT OF FACTS

I.   Initiation Of Review And Selection Of Mandatory Respondents

In April 2022, Commerce initiated an administrative review of 261 exporters of subject merchandise, including Megaa Moda. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 21,619 (Dep't of Commerce Apr. 12, 2022) (P.R. 12). Commerce selected Devi Fisheries Group (Devi) and Nekkanti Sea Foods Limited (Nekkanti) as the mandatory respondents.  Respondent Selection Mem. (P.R. 34, C.R. 4).  In July 2022, Commerce received timely submissions withdrawing all review requests for 74 exporters, including Devi and Nekkanti.  Commerce then selected Megaa Moda and NK Marine Exports LLP (NK Marine) as the mandatory respondents.[2]  *Certain Frozen Warmwater Shrimp From India*, 88 Fed. Reg. 13,430 (Dep't of Commerce Mar. 3, 2023) (preliminary results) (P.R. 168), and the accompanying Preliminary Decision Memorandum at 2 (Dep't of Commerce Apr. 29, 2022) (PDM) (P.R. 159); 2d Respondent Selection Mem. (P.R. 81, C.R. 32).

---

[2]  Because NK Marine has not challenged the final results, we discuss the facts only as relevant to Megaa Moda.

II.    <u>Preliminary Results</u>

On July 21, 2022, after selecting Megaa Moda as one of the two mandatory respondents, Commerce issued its initial questionnaire to Megaa Moda.  Megaa Moda Initial Questionnaire (P.R. 82, C.R. 32).  In Megaa Moda's timely Section A questionnaire response, Megaa Moda reported that it had a viable home market and supported this response with a quantity and value chart showing that the volume of sales in the home market was [          ] of the volume of sales in the U.S. market.  Megaa Moda Section A Questionnaire Resp. (AQR) at Exhibit A.1 (P.R. 115, C.R. 36).  In its Section B and C responses, Megaa Moda provided Commerce information covering comparison market sales and U.S. sales.  Megaa Moda Section B&C Questionnaire Resp. (BCQR) (P.R. 118-127, C.R. 52-58).

On December 21, 2022, AHSTAC submitted comments alleging that [      ] of Megaa Moda's home market sales (accounting for [      ] kilograms of its total home market sales quantity of [      ] kilograms) were intended for the export market because the sales were made to [                                                            ] and were aberrational compared to Megaa Moda's other home market sales.  AHSTAC Comments on Megaa Moda's Resp. to Sections A, B, and C of the Questionnaire (P.R. 134, C.R. 73).  On January 13, 2023, Commerce issued a supplemental questionnaire to Megaa Moda regarding certain of its sales to its customer [          ] and whether those sales were appropriately reported as home market sales.  Supplemental Section A-C Questionnaire (Supp. ABCQ) (P.R. 139, C.R. 75).  Specifically, Commerce asked Megaa Moda the following:

> The vast majority of your home market sales were to [          ]. Provide a detailed explanation of why you believe your sales of shrimp to [          ] were for consumption in India, rather than for export to another market.

*Id.* at 7.  In response, Megaa Moda stated:

> Megaa is submitting sample documentation for SEQU 76
> pertaining to sales made to [ ███████ ] as Exhibit S1-8.  From
> purchase order (Page-1) it can be seen that the destination of the
> sale is [ ████████ ].  From the copy of Tax Invoice (Page-2)
> it can be seen that the place of delivery is [ ███████████
> ████████████ ].  From e-way bill it can also
> be seen that the place of delivery is [ ██████████████
> █████████████████ ].  Thus, from all the three
> documentation it can be seen that the material was destined to be
> delivered in the domestic market.  Further the order was Ex-works
> and the material was picked by the customer.  As the material was
> delivered in India and was also destined in India, Megaa classified
> the same as domestic sales. Megaa has no indication, knowledge or
> documentation to suggest that the material was destined to be
> consumed in export market. Moreover, the goods were packed in
> Unbranded pouches and cartons which under any situation may not
> be suitable for U.S. market.  So we can safely say that goods were
> sold domestically in India.

Megaa Moda Supp. ABCQR at 19 (P.R. 149, C.R. 82).  Megaa Moda also provided

documentation that included customer correspondence, a tax invoice, an e-way bill, accounting

records showing the recording of the sale, and payment documentation.  Megaa Moda Supp.

ABCQR (P.R. 149-50, C.R. 82-86).  This information showed that Megaa Moda made this sale

to a home market customer in India (*i.e.*, [ ██████████ ]) with ex-works delivery terms.  *Id.*

On September 22, 2022, Megaa Moda timely responded to Section D of the Initial

Questionnaire.  Megaa Moda Section D Questionnaire Resp. (Megaa Moda DQR) (P.R. 129-31,

C.R. 63-66).  In its response, Megaa Moda provided its cost allocation for the period of review

and its net interest expense ratio calculation.  *Id.* at Exhs. D-7 (Cost Allocation) (P.R. 129-130,

C.R. 63,) D-14 (INTEX Ratio Calculation) (P.R. 130, C.R. 64).

Commerce thereafter issued a supplemental Section D questionnaire asking Megaa Moda

to "explain the nature of the interest subvention received of [ ██████████ ] {Indian rupee

(INR)}."  Section D Supp. Questionnaire at 8 (Supp. DQ) (P.R. 140, C.R. 76).  Commerce also

requested Megaa Moda to "provide supporting documentation that the interest income offset is

derived from interest income earned on short term assets." *Id.*  In its timely response, Megaa Moda explained the interest subvention program and provided the regulations governing the subvention program, a webpage explaining the nature of the loans underlying the interest refunds, a bank statement identifying the interest subvention income received, and screenshots from its accounting system linking the refunded payments to the bank statement.  Megaa Moda Section D Questionnaire Resp. (Megaa Moda SDQR) at Exhibits SD1-12 (regulations and webpage), Exhibit SD1-12(a) (bank statement), and Exhibit SD-12(b) (screenshots) (P.R. 154, C.R. 92).

On March 3, 2023, Commerce published the preliminary results, preliminarily determined that Megaa Moda had made sales of shrimp at prices below normal value and calculated a preliminary weighted-average dumping margin of 7.92 percent for Megaa Moda. *Certain Frozen Warmwater Shrimp From India*, 88 Fed. Reg. at 13430.  Commerce relied on all of Megaa Moda's reported home market sales in its preliminary calculation of normal value.  *See* PDM at 14.  Commerce also preliminarily denied two interest income offsets for Megaa Moda. *Id.* at 13.  For companies not selected for individual review, Commerce calculated a preliminary weighted-average dumping margin of 3.76 percent.  *Certain Frozen Warmwater Shrimp From India*, 88 Fed. Reg. at 13430.

Commerce also preliminarily determined that "the aggregate volume of {Megaa Moda's} home market sales of the foreign like product was sufficient to permit a proper comparison with U.S. sales of the subject merchandise.  PDM at 9.  Therefore, Commerce used home market sales as the basis for normal value for Megaa Moda.  *Id.* at 10.

Commerce also preliminarily denied Megaa Moda's requested subvention program offset as well as the "FD with FBL"[3] program offset.  *Id.* at 13.  With respect to the subvention program, Commerce preliminarily determined that the interest earned did not relate to short-term investments of the company's working capital.  *Id.*; Preliminary Results Calculations (P.R. 164, C.R. 105).  With respect to the "FD with FBL" offset, Commerce preliminarily determined that Megaa Moda had not provided evidence that the interest was earned on short-term investments of the company's working capital.  PDM at 13.

III.    Administrative Case Briefs

Megaa Moda and AHSTAC timely filed case and rebuttal briefs.  AHSTAC Case Br. (P.R. 172, C.R. 115); Megaa Moda Revised Case Br. (P.R. 197. C.R. 127); AHSTAC Rebuttal Case Br. (P.R. 176, C.R. 119); Megaa Moda Rebuttal Case Br. (P.R. 188, C.R. 124).  ASPA also timely filed a rebuttal brief.  ASPA Rebuttal Br. (P.R. 178, C.R. 120).

In its case brief, AHSTAC argued that Commerce should have excluded certain of Megaa Moda's home market sales from the calculation of normal value, AHSTAC's Case Br. at 1-17, and ASPA joined in agreement with AHSTAC on this issue.  ASPA Rebuttal Br. at 1-6. AHSTAC claimed that a review of the record demonstrates that the sales in question were meant for export, not for consumption in the home market.  AHSTAC Case Br. at 3-14.  AHSTAC also argued that Commerce should apply facts available with an adverse inference as to how to treat these sales because "Megaa Moda's willful inaccurate representations regarding the nature of these home market sales has significantly impacted this proceeding and has, in particular, prevented the Department from developing a meaningful understanding of these sales."  *Id.* at

---

[3] Across all of Megaa Moda's record submissions the term "FD with FBL" was never defined by Megaa Moda.

14.  Lastly, AHSTAC argued that because "correcting" the normal value calculation with the change it asserted would have necessarily resulted in a change in the dumping margin, Commerce must recalculate the rate assigned to companies not selected for individual review. *See id*. at 17-18.

In rebuttal, Megaa Moda argued that Commerce correctly treated the sales in question as home market sales.  Megaa Moda Rebuttal Case Br. at R-4–R-12.  Megaa Moda claimed that AHSTAC completely ignored certain parts of the record that support Commerce's determination that the sales in question were for consumption in the home market.  *See id.*

In its case brief, Megaa Moda argued that Commerce should grant two short term interest income offsets.  *See* Megaa Moda Revised Case Br.  With respect to the interest subvention program, Megaa Moda argued that based on record information, it had proven the short-term nature of income generated from the interest subvention program and therefore an offset should have been granted.  *Id.* at 6-9.  With respect to interest on "FD with FBL," again, a term never defined nor explained, Megaa Moda argued that because the income is grouped under cash and cash equivalent in an audited financial statement, Commerce should have granted an offset.  *Id.* at 9-13.

In rebuttal, AHSTAC argued that Commerce was correct to deny both requested short-term interest income offsets.  AHSTAC Rebuttal Case Br. at 1-10.  With respect to the interest subvention program, AHSTAC argued that the income generated by the program is not a gain on investments but rather this program is an export subsidy program that should be separately investigated in a countervailing duty investigation.  *Id*. at 2-8.  With respect to the interest on "FD with FBL," AHSTAC argued that Megaa Moda had failed to build an adequate administrative record to support its claim for an offset.  *Id.* at 8-10.  ASPA additionally argued

that the interest subvention program income generated was not a part of Megaa Moda's working capital assets.  ASPA Rebuttal Br. at 7-9.

IV.    Final Results

On September 1, 2023, Commerce published the final results, calculating a weighted average dumping margin of 7.92 percent for Megaa Moda.  *Certain Frozen Warmwater Shrimp From India*, 88 Fed. Reg. at 60,432.  Commerce continued to rely on all of Megaa Moda's reported home market sales to calculate normal value.  IDM at 6-9.  Commerce explained that "to determine whether a sale should be included in in the home market sales data," its practice is to consider whether the "producer knew or should have known at the time of sale that the merchandise was for consumption in the home market."  *Id.* at 8-9 (citing *Certain Lined Paper Products from India*, 88 Fed. Reg. 21,971 (Dep't of Commerce Apr. 12, 2023) (final admin. review), and accompanying IDM at Comment 1).  In applying that standard, Commerce assessed "documentary or physical evidence" and determined that there was no evidence on the record that Megaa Moda had knowledge at the time of certain sales that those sales were destined for export.  *Id.* at 9; *see also* Proprietary Memorandum for the Final Results (Proprietary Decision Mem.) (P.R. 204, C.R. 130).

Commerce also continued to deny Megaa Moda's requested interest subvention program offset, consistent with Commerce's well-established practice.  IDM at 13-14.  Commerce explained that, based on Megaa Moda's explanation of the program, Commerce determined that the interest subvention was generated from the refund of interest expenses from export credit, not from Megaa Moda's current assets and working capital accounts.  *Id*.

Next, Commerce continued to deny Megaa Moda's requested interest on "FD with FBL" offset.  *Id.* at 14.  Commerce explained that it had specifically asked Megaa Moda to demonstrate

the short-term nature of the interest income offset.  *Id.*  Commerce found that because Megaa

Moda did not provide supporting documentation for the short-term nature of the interest income

offset derived from "interest on FD with FBL," Megaa Moda did not fully substantiate the

interest income offset and, therefore, was not entitled to it.  *Id.*

Finally, Commerce calculated a weighted average dumping margin for 3.88 percent for

companies not selected for individual review.  *Id.* at 4; *Certain Frozen Warmwater Shrimp From*

*India*, 88 Fed. Reg. at 60,432.

SUMMARY OF ARGUMENT

Commerce's determination to rely on all of Megaa Moda's reported home market sales in

calculating normal value is supported by substantial evidence.  First, Commerce reasonably

determined that substantial evidence shows that Megaa Moda had neither actual nor constructive

knowledge that certain sales were not sold for consumption in India.  The Court should reject

AHSTAC's arguments in favor of alternative interpretations of the record evidence because this

merely reflects disagreements with Commerce's lawful exercise of its discretion to weigh the

evidence, and, thus, are meritless.

Second, Commerce's determination to deny two of Megaa Moda's requested short term

interest income offsets is supported by substantial evidence.  Commerce reasonably determined

that, based on Megaa Moda's explanation of the interest subvention program, income obtained

through that program was not short-term in nature.  Commerce's practice is to allow a

respondent to offset financial expenses with short-term interest income, *i.e.*, income generated

from the company's current assets and working capital accounts.  But Megaa Moda's

explanation of the program demonstrates that the interest subvention income was generated from

the refund of interest expenses from export credit, *not* from the company's current assets and

working capital accounts. Therefore, Commerce reasonably determined that Megaa Moda was

not entitled to a short-term interest income offset for income claimed under the subvention

program. In addition, Commerce reasonably determined that the record lacked sufficient

evidence to determine whether Megaa Moda was entitled to a short-term interest income offset

for interest on "FD with FBL" because Megaa Moda did not provide Commerce with supporting

documentation for the short-term nature of the interest income offset.

Finally, Commerce's calculation of the rate assigned to companies not selected for

individual review is supported by substantial evidence because it lawfully relied on all of Megaa

Moda's reported home market sales.

ARGUMENT

I.    Legal Standards

   A.    Standard of Review

This Court sustains any determination, finding, or conclusion made by Commerce unless

it is unsupported by substantial evidence upon the record, or otherwise not in accordance with

law. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its

interpretation are conclusive unless unsupported by substantial evidence." *United States v.

Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" means

"more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to

support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253

(Fed. Cir. 2009) (internal quotation marks and citations omitted).

Even if the Court may draw two inconsistent conclusions from the evidence contained in

the record, doing so "does not prevent an administrative agency's finding from being supported

by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation

omitted). An agency decision may not be overturned "simply because the reviewing court would

have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501

F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

      B.    <u>Normal Value Calculation Legal Framework</u>

      The antidumping duty statute provides for the application of remedial duties to foreign

goods sold, or likely to be sold, in the United States "at less than its fair value." 19 U.S.C.

§ 1673. Once Commerce issues an antidumping duty order, the agency conducts administrative

reviews to determine the dumping margin for each entry subject to the review. *Id.* § 1675 (a)(1),

(2)(A)(ii). A dumping margin is the amount by which the "'normal value' (the price a producer

charges in its home market) exceeds the 'export price' (the price of the product in the United

States) or 'constructed export price.'" *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353

(Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (cleaned up).

      In antidumping duty proceedings, when Commerce examines the pricing behavior of a

respondent in its home market as compared to the United States, Commerce applies a

"knowledge test" to determine whether the respondent had knowledge of a sale that was destined

for the United States, and was, thus, the "price discriminator" for that sale. *Antidumping and

Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 Fed. Reg. 23,954,

23,957, 23,960 (Dep't of Commerce May 6, 2003); *Antidumping and Countervailing Duty

Proceedings: Assessment of Antidumping Duties*, 63 Fed. Reg. 55,361, 55362 (Dep't of

Commerce October 15, 1998); *see also NSK Ltd. v. Koyo Seiko Co.*, 190 F.3d 1321, 1334 (Fed.

Cir. 1999) (affirming the use of the "knowledge test" as a reasonable interpretation of the

Statement of Administrative Action pursuant to the Trade Agreements Act of 1979, Pub. L. No.

96-39, 93 Sat. 144 (1979)).  Under the "knowledge test," Commerce evaluates whether the producer "knew or should have known at the time of the sale that the merchandise was being exported for the United States."  *Yue Pak, Ltd. v. United States ITA*, 20 C.I.T. 495, 498 (1996), *aff'd*, 111 F.3d 142 (Fed. Cir. 1997); *see also Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2000).

Actual knowledge requires "an admission of the respondent" that the company knew the actual destination of the merchandise being sold.  *INA Walzlager Schaeffler KG v. United States*, 957 F. Supp. 251, 265 (Ct. Int'l. Trade 1997).  Constructive knowledge, however, requires that Commerce must "diligently inquire into allegations of knowledge and render its conclusion based on all relevant facts and circumstances," not just on respondent admissions.  *Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1310 (Ct. Int'l. Trade 2019) (citation omitted), *aff'd in part, vacated in part, remanded on other grounds*, 5 F.4th 1341 (Fed. Cir. 2021).

II.    Substantial Evidence Supports Commerce's Determination To Rely On All Of Megaa Moda's Reported Home Market Sales For the Calculation of Normal Value

Commerce concluded that Megaa Moda neither knew nor should have known that certain of its sales to [          ] were being exported to the United States because Megaa Moda claimed that it did not have actual knowledge, and Commerce's examination of the evidence led to it finding that there was neither actual nor constructive knowledge that certain sales were being exported to the United States.  *See* IDM at 8-9; Proprietary Decision Mem. at 3-5. Therefore, Commerce relied on all of Megaa Moda's reported home market sales for the calculation of normal value.

AHSTAC argues that certain of Megaa Moda's home market sales should have been excluded from the calculation because Megaa Moda knew or should have known that those home market sales would be re-exported.  AHSTAC Br. at 13-18.  AHSTAC also argues that

Commerce improperly rejected documentary evidence showing that Megaa Moda knew or should have known that its sales to [■■■■■■] were meant for export to the United States and not for consumption in the domestic market. *Id.* at 18-23. AHSTAC's arguments are meritless.

As an initial matter, [■■■■■■], Megaa Moda's customer, [■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■] [■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■]. Therefore, contrary to AHSTAC's contention, Megaa Moda's sales to [■■■■■] could not have been meant for export. *See* Proprietary Decision Mem. at 4. Even without this fact, AHSTAC's argument fails because Commerce's weighing of the evidence in the final results is supported by substantial evidence and AHSTAC's displeasure at the result is not a sufficient basis for this court to find in its favor. *See OTR Wheel Eng'g, Inc. v. United States*, 901 F.Supp.2d 1375, 1380 (Ct. Int'l Trade 2013) ("the {C}ourt will not re-weigh the evidence presented to Commerce, and will uphold Commerce's determination provided it chooses from among the range of possible reasonable conclusions based on the record.").

A.    Commerce Reasonably Declined To Impute Knowledge to Megaa Moda Regarding Its Home Market Sales

In the final results, Commerce employed the knowledge test to determine whether Megaa Moda knew or should have known that the merchandise was destined for home market consumption, and Commerce declined to impute knowledge to Megaa Moda that certain of its sales were not meant for consumption in the home market. IDM at 8-9; Proprietary Decision Mem. at 1-6. As Commerce explained in the final results, its general practice in conducting the "knowledge test" is to consider documentary or physical evidence that the producer knew or should have known at the time of sale that the merchandise was for consumption in the home market because this type of evidence is more probative, reliable, and verifiable than

14

unsubstantiated statements or declarations.  IDM at 8-9.  AHSTAC challenges Commerce's

application of the knowledge test, claiming that documentary evidence demonstrated that

"Megaa Moda's sales to [ ███████████████████████ ] were not made

for consumption in India."  AHSTAC Br. at 13.  As discussed below, AHSTAC's arguments are

meritless.

      1.    The Record Evidence Demonstrated That [ ████████████
                ████ ] Were Not Applicable To Domestic Sales Of Unbranded
                Shrimp Such That Imputing Knowledge To Megaa Moda That Its Sales
                Were Meant For Export To The U.S. Would Be Unreasonable



AHSTAC argues, without support, that because Megaa Moda [ ██████████████████

████████████████ ] on either the [ ████████████ ] or the other U.S. sales, Commerce

should have imputed knowledge to Megaa Moda.  AHSTAC Br. at 14-15.  However, Commerce

reasonably found that record evidence did not support a finding that Megaa Moda should have

known that [ ██████████████████████████████████████

████████ ] would necessarily result in export to the United States because such taxes were not

applicable to domestic sales of unbranded shrimp.  Proprietary Decision Mem. at 5.  As

Commerce explained in the final results, "there is no information on the record that the combined

[ ████████████████████████████████████████ ] are

specific to the domestic market or that the absence of these taxes is evidence of an export sale."

*Id.* at 5.  Rather, the record evidence demonstrates that [ ████████████████████ ] depended

on the type of shrimp sold.  *Id.*  Under Indian law, [ ██████ ] referenced by AHSTAC apply

only to [ ██████████████████ ].  Megaa Moda Rebuttal Case Br. at R-3.  Thus, Commerce

observed that on sales of certain branded shrimp, [ ████████████ ], Megaa Moda paid [ ██████

████████████ ] while it did not [ ████████████████████████ ] on their sales of the

unbranded shrimp to [ ████████ ].  Proprietary Decision Mem. at 5.



2.    **Because [          ] The Fact That [          ] Was Not Sufficient To Impute Knowledge To Megaa Moda That Its Sales To [          ] Were Meant For Export To The U.S.**

Next, AHSTAC argues that Commerce recognizes [          ] as an exporter, and that sales made to [          ] therefore were meant for export to the U.S., especially considering that no [          ]. AHSTAC Br. at 15-16. But Commerce reasonably found that record evidence did not support a finding that Megaa Moda should have known that [          ] status as an exporter would necessarily result in export to the United States. IDM at 8-9; *see* Proprietary Decision Mem. at 4. Although Commerce recognized that [          ] was also an exporter, IDM at 8, this Court has held that the trade patterns of a company's customers do not provide an adequate basis for establishing that sales to such customers are not representative. *Z.A. Sea Foods Priv. Ltd. v. United States*, 569 F. Supp. 3d 1338, 1351 (Ct. Int'l Trade 2022). Moreover, as explained above, [          ]. [          ] Therefore, Commerce reasonably found that Megaa Moda's sales to [          ] could not have been meant for export. Proprietary Decision Mem. at 4.

3.    **Given [          ], The Volume Sold To [          ] Was Not Aberrational Such That It Would Be Improper To Impute Knowledge To Megaa Moda That Its Sales Were Meant For Export To The U.S.**

AHSTAC argues that the volume of the [          ] sales made to [          ], are aberrational when compared to Megaa Moda's other home market sales. AHSTAC Br. at 16. Thus, AHSTAC claims that "Megaa Moda was clearly aware that its sales to [          ] were unlike the [          ] of the company's sales to other customers in the home market." *Id.* This speculative reasoning does not distract from Commerce's reasonable determination to

decline to impute actual or constructive knowledge to Megaa Moda based on differing volumes of sales.

For example, Commerce reasonably found that record evidence did not support a finding that Megaa Moda should have known that the volume of shrimp sold to [ ▇▇▇ ] would necessarily result in export to the United States.  Proprietary Decision Mem. at 4.  As Commerce explained in the Proprietary Memorandum, [ ▇▇▇▇▇▇▇▇ ] dwarfs that of Megaa Moda's.  *Id.*  [ ▇▇▇▇ ] total quantity of entries for the period of review was [ ▇▇▇▇▇▇▇▇ ], Respondent Selection Mem. at Att. 1, whereas Megaa Moda's total quantity of entries for the period of review was [ ▇▇▇▇ ], 2nd Respondent Selection Mem. at Att. 1, a mere [ ▇▇▇ ] of [ ▇▇▇▇▇ ].  Thus, for a company of [ ▇▇▇▇ ], the volume of the [ ▇▇ ] sales made to [ ▇▇▇ ] by Megaa Moda, although seemingly large compared to Megaa Moda's other customers, is perfectly reasonable for [ ▇▇▇ ].  *See* Proprietary Decision Mem. at 4.

4.    Given That Megaa Moda Made Sales To The U.S. Of Both [ ▇▇▇▇ ] and [ ▇▇▇▇▇▇ ] Shrimp, Imputing Knowledge To Megaa Moda That Its Sales Were Meant For Export To The U.S. Would Be Unreasonable

AHSTAC argues that because Megaa Moda sold [ ▇▇▇▇▇ ] shrimp to [ ▇▇▇ ] whereas the rest of its home market sales were [ ▇▇▇▇▇ ] shrimp, this somehow is enough to impute knowledge of sales destined for export to Megaa Moda.  AHSTAC Br. at 16-17.  AHSTAC again is mistaken.  Commerce reasonably found that record evidence did not support that Megaa Moda should have known that selling [ ▇▇▇▇▇ ] shrimp would necessarily result in export to the United States.  Proprietary Decision Mem. at 6.  As Commerce explained in the Proprietary Memorandum, [ ▇▇▇▇ ] was not a unique characteristic such that knowledge could be imputed to Megaa Moda as to the destination of the

17

sales in question.  *Id.*  As the record demonstrates, Megaa Moda had sales in the U.S. and in the

home market of both [ ███████████████ ] and [ ███████████ ].  *Id.* at 6.

Commerce, therefore, reasonably declined to impute knowledge to Megaa Moda, and that

decision is supported by substantial evidence.  *Id.*

However, the Court should reject a new argument that AHSTAC did not argue before

Commerce, wherein Commerce identified a mistake that the parties had made in the

administrative briefing stage and noted that correction in the proprietary decision memo.

Proprietary Decision Mem. at 5 n.28.  To wit, AHSTAC argues that "Commerce's correction

underscores that while Megaa Moda's sales to all other customers in India were of a [ ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ ]."  AHSTAC Br. at 16-17 n.11.

This Court "shall, where appropriate, require the exhaustion of administrative remedies."

28 U.S.C. § 2637(d).  "This statutory mandate 'indicates a congressional intent that, absent a

strong contrary reason, the court should insist that parties exhaust their remedies before the

pertinent administrative agencies.'"  *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912

(Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir.

2007)).  By regulation, interested parties must raise in their case brief all arguments that remain

"relevant" to Commerce's "final determination or final results."  *Corus Staal BV*, 502 F.3d at

1378 (citing 19 C.F.R. § 351.309(c)(2)).  Interested parties must exhaust administrative remedies

with respect to all issues that they have notice may be decided by Commerce in its final

determination or final results.  *See Boomerang*, 856 F.3d at 913 (requiring exhaustion of

administrative remedies even when Commerce changes its reasoning from the preliminary

determination, so long as parties knew or should have known that Commerce may consider the issue in the final determination).  Because AHSTAC had the opportunity before Commerce to argue that a particular [      ] is more [        ], but failed to do so, it has failed to exhaust its administrative remedies before Commerce.  *See* AHSTAC Br. at 16-17 n.11.

          5.       Imputing Knowledge To Megaa Moda's U.S. Sales Of [     ] Shrimp Would Be Unreasonable

      Next, AHSTAC argues that because Megaa Moda's sales to [    ] were the only sales of [      ] shrimp in Megaa Moda's home market, and because Megaa Moda sold [      ] shrimp in the U.S. market, that Megaa Moda should have known that its sales of the same to [    ] were meant for export.  AHSTAC Br. at 17.  This, again, is pure speculation.

      Commerce reasonably found that record evidence did not support that Megaa Moda should have known that selling [      ] shrimp would necessarily result in export to the United States.  Proprietary Decision Mem. at 6.  As Commerce explained, this type of speculative comparison is not meaningful to determining whether Megaa Moda had constructive knowledge.  *Id.*  However, even assuming that it were, Megaa Moda's sales of [    ] shrimp to the U.S. was only a small percentage, [     ], of its total sales in the U.S. market.  *Id.*  Nor would this fact by itself support imputing knowledge onto Megaa Moda.  Commerce found that after weighing the evidence and arguments, that the differences between Megaa Moda's home market sales and U.S. sales were not meaningful indicators that the products at issue in the home market must be U.S. sales.  *Id.*  AHSTAC's mere disagreement does not undermine Commerce's determination.  *See OTR*, 901 F. Supp. 2d at 1380.

6. The Use Of A [█████████] With The Word [█████████]
Was Insufficient To Impute Knowledge To Megaa Moda That Its Sales
Were Meant For Export To The U.S When The Facilitated Sales Were
<u>Made To An Indian Company At An Indian Address</u>

Finally, AHSTAC argues that because the sales to [██████] were negotiated by a

company with the word [██████████] in it, [█████████████], and [█████████████

██████████████████████] Megaa Moda should have known that the sales were

not made for consumption in the home market. AHSTAC Br. at 17-18. AHSTAC's argument is

nonsensical.

Commerce reasonably found that record evidence did not support that Megaa Moda

should have known that use of a [█████████████] would necessarily result in export to the

United States. Proprietary Decision Mem. at 4. As Commerce explained, "the use of a

[██████████████████████] in its name does not demonstrate that sales are

intended for an export market." *Id.* Indeed, "{b}usinesses that use the word "[██████████]"

in their name often make sales in both the domestic and international markets; for example, the

company [███████████████████████] has a substantial domestic

market." *Id.* (citing Megaa Moda SQR at Exhibit S1-8).

Moreover, the record evidence demonstrates that [████████████] did not broker

sales to a foreign company or a foreign country; rather, the record evidence shows that [████

██████] brokered a deal for Megaa Moda to sell shrimp to an Indian customer, with

delivery in India, and an Indian address as the destination. *Id.* Therefore, Commerce's

determination to decline to impute knowledge onto Megaa Moda is reasonable and supported by

substantial evidence.

20

B.    Record Evidence Demonstrates That Commerce Considered AHSTAC's
Additional Arguments and Reasonably Concluded These Arguments Lacked
Merit

AHSTAC argues that Commerce either ignored or failed to consider relevant evidence

and arguments in its case brief showing differences between Megaa Moda's sales to [          ]

and its sales to other home market customers.  AHSTAC Br. at 18-23.  This argument is

meritless and undermined by the record.

As a general matter, as demonstrated below, Commerce's analysis considered the

evidence that AHSTAC identifies; Commerce, however, disagreed with AHSTAC's analysis of

this evidence and determined a different result.  Commerce's thorough summary of both Megaa

Moda and AHSTAC's arguments before the agency demonstrate that Commerce considered the

evidence and arguments, and Commerce even drafted a separate memorandum addressing

AHSTAC's arguments based on only business proprietary information.  *See* IDM at 6-9;

Proprietary Decision Mem. at 1-5.  AHSTAC's mere disagreement with Commerce's weighing

of the record evidence is not a basis to overturn Commerce's determination.  *See Gov't of*

*Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021).

First, AHSTAC's insinuation that Commerce failed to engage with arguments that

AHSTAC presented because Commerce's analysis of the home market sales issue was limited in

its public IDM is unfounded.  *See* AHSTAC Br. at 18 (citing IDM at 9).  As Commerce

explained in the IDM, the home market sales issue raised discussion of business proprietary

information.  IDM at 9 nn. 47, 50-51.  Given Commerce's statutory obligation to protect the

confidential nature of such information, Commerce's decision to keep its public analysis of the

home market sales issue limited is reasonable.  Moreover, Commerce more than adequately

addressed AHSTAC's arguments in the proprietary memorandum.  *See* Proprietary Decision Mem. at 1-6.

Second, AHSTAC argues that Commerce did not adequately address the evidence and arguments concerning the absence of [ ███ ] on Megaa Moda's sales to [ ██████ ]. AHSTAC Br. at 18-19.  AHSTAC points to Megaa Moda's home market sales database to demonstrate that Megaa Moda collected [ ████ ] on its home market sales.  *Id.*  AHSTAC claims that by determining that there was no record information that showed that [ ████ ] were specific to the domestic market, Commerce ignored the significance of this information and relied instead on Megaa Moda's unsupported statements.  *Id.* at 19.  That is incorrect. Commerce assigned significance to this information and did not rely on Megaa Moda's statements but rather on documentary evidence as required.  As Commerce explained in the final results, it found that the record supported Megaa Moda's claim that [ ████ ] do not apply to domestic sales of unbranded shrimp.  Proprietary Decision Mem. at 5.  Examining the same database as AHSTAC, Commerce found that Megaa Moda's home market sales database had [ ████ ] listed for its branded shrimp, but did not have [ ████ ] listed for its *unbranded* shrimp. *Id.*

Thus, Commerce reviewed the same evidence that AHSTAC identifies but came to a different conclusion than AHSTAC after observing that [ ████ ] appeared to not be applicable to domestic sales of unbranded shrimp.  Where AHSTAC theorized that the existence of [ ████ ] demonstrated an export sale, AHSTAC Br. at 18-19, Commerce conversely determined that the existence of [ ████ ] could be explained by whether the shrimp sold was branded or unbranded. Proprietary Decision Mem. at 5.  Even if the Court (or the parties) may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an

22

administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620. Moreover, an agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

Third, AHSTAC argues that Commerce failed to meaningfully address the argument that "Megaa Moda's sales to [ ███████████████████████████ ]," specifically [ ████ ]. AHSTAC Br. at 19-20. But Commerce determined, as it explained in the final results, that AHSTAC's comparison of Megaa Moda's home market sales at issue and its U.S. sales is speculative because the evidence on the record does not indicate that Megaa Moda had actual or constructive knowledge that the home market sales were destined for export. Proprietary Decision Mem. at 6. Specifically, Commerce found that [ ██████ ] was not a unique characteristic, meaning [ ██████ ] was not indicative of an export sale. *Id.* For example, Megaa Moda sold both [ ████████████ ] and [ ██████ ] shrimp to the U.S. market. *Id.* Thus, it is not readily apparent from the record evidence that a [ ██████ ] sale to an *Indian company* at an *Indian address*, would mean that the sale was destined for export. To that end, the fact that Megaa Moda's sales to [ ██████ ] were its only [ ██████ ] sales in the domestic market is immaterial. Commerce explained this in the final results, and therefore, Commerce meaningfully addressed AHSTAC's argument. *See id.*

Fourth, AHSTAC argues that Commerce's analysis failed to engage with record evidence showing that Megaa Moda's sales to [ ██████ ] were of a [ ████████████████ ██████████ ]. AHSTAC Br. at 20-21. Again, AHSTAC is merely speculating in its comparison of Megaa Moda's sales. As Commerce stated in the proprietary decision memorandum, to the extent that AHSTAC's comparison of Megaa Moda's home market sales at

issue with its U.S. sales is a meaningful exercise, Commerce found that *only* [ █████ ] percent of

Megaa Moda's reported U.S. sales were of [ ████████ ] shrimp.  Proprietary Decision Mem. at

6.  Implicit in this statement is that the relatively small percentage of sales of [ ████████ ]

shrimp to the U.S. market would not make it obvious to Megaa Moda that its sales of that

shrimp to [ ██████ ] were meant for export.  *Id.*  Thus, not only did Commerce engage with the

record evidence implicated by AHSTAC's argument, it found that the evidence, in addition to

other record evidence, supported a findingthat Megaa Moda neither knew nor should have

known that its sales to [ ██████ ] were for export.  *Id.*

Fifth, AHSTAC argues that Commerce's finding that Megaa Moda's sales to [ ████████ ]

were delivered to "a location in India" fails to support the agency's conclusion that Megaa Moda

lacked knowledge that the sales in question were not for consumption in the home market.

AHSTAC Br. at 21.  In other words, AHSTAC contends that the fact that the sales were

delivered within the home market cannot override the other evidence allegedly showing that

Megaa Moda had some form of knowledge that its sales to [ ███████ ] were meant for export.

*Id.*  AHSTAC's argument is meritless.

As an initial matter, AHSTAC's assertion is factually inaccurate.  In the final results,

Commerce relied on more than simply the delivery location to find that the home market sales

were properly reported.  *See* Proprietary Decision Mem. at 4-5.  As Commerce explained in the

proprietary decision memorandum, "information showed that that Megaa Moda made {[ █████

█████████████████████ ]} to a home market customer in India (i.e., [

█████████ ]) with ex-works delivery terms."  *Id.* at 4.  However, Commerce also found that

"during the {period of review}, { [ ███████ ] } produced all frozen shrimp that it sold in the

United States and China."  *Id.*  Moreover, Commerce also accounted for the fact that [ ████████

████████████████████████ ] at the delivery location.  *See id.* at n.25.  Thus, Commerce relied

on more than just "the mere fact that the sales were delivered within the home market,"

AHSTAC Br. at 21, to support its decision.  *See* Proprietary Decision Mem. at 4-5.

Finally, AHSTAC argues that Commerce failed to consider the fact that [ ████████ ] is a

known exporter of shrimp.  AHSTAC Br. at 21-22.  In its argument, AHSTAC references only

the public decision memorandum, and does not reference or grapple with Commerce's *additional*

findings in the proprietary memorandum, wherein Commerce explains what other evidence it

considered in making its determination.  *See generally* Proprietary Decision Mem.  Indeed,

Commerce examined [ ████████████████████████████████████

████████████████████████████████████. ] *Id.* at 4.

Commerce also evaluated [ ████████████████████████ ] produced all shrimp

that it exported during the period of review.  *Id.*  Commerce even acknowledged that [ ████████ ]

may have processed some of the shrimp it bought from Megaa Moda into breaded shrimp, *i.e.*

non-subject merchandise.  *Id.* at n.25.  Thus, as Commerce explained in the proprietary decision

memorandum, Commerce did evaluate [ ████████ ] trade patterns and behaviors, and even had

confirmation from [ ████████ ] that [ ████████ ] did not export shrimp it bought from Megaa

Moda.  *See id.* at 4 (citing [ ████████████████████ ]).  AHSTAC's mere disagreement

with Commerce's conclusion, which is otherwise supported by substantial evidence, is not a

reason to remand Commerce's final results.  *See Gov't of Argentina*, 542 F. Supp. 3d at 1395.

III.    Substantial Evidence Supports Commerce's Determination To Deny Megaa Moda's
        Requested Short Term Interest Income Offsets

Commerce determined to deny two of Megaa Moda's requested short term interest

income offsets.  IDM at 13-14.  Megaa Moda argues that the requested offsets should have been

granted because Megaa Moda had demonstrated the "short-term nature of its various interest

income and its suitability as an offset to its financial expenses," through its detailed

documentation provided in response to Commerce's questionnaires. Megaa Moda Br. at 7-8.

Therefore, according to Megaa Moda, Commerce's decision not to grant those offsets was not

only inconsistent with Commerce's practice, but also showed a failure by Commerce to address

the record evidence. *Id.* at 8.

Megaa Moda's arguments are unpersuasive and misunderstand Commerce's practice.

Record evidence demonstrates that Megaa Moda's interest subvention program income did not

derive from its working capital accounts such that granting an interest income offset for this

program would be inappropriate. IDM at 14. With respect to the interest on "FD with FBL,"

Megaa Moda did not adequately substantiate its claim for this program with supporting evidence;

indeed, it did not even define "FD with FBL." *Id.* Thus, Commerce's determination to deny the

requested offsets is lawful and supported by substantial evidence. IDM at 13-14.

A.    Substantial Evidence Supports Commerce's Determination To Exclude The
       Portion Of the Interest Income Offset Related To The Interest Subvention
       <u>Program From The Calculation Of Megaa Moda's Financial Expense Ratio</u>

In the final results, Commerce denied Megaa Moda's requested interest subvention

program offset. IDM at 14. To determine whether to deny this requested offset, Commerce

applied its well-established practice to allow a respondent to offset financial expenses with short-

term interest income if the record supports it. *Id.* This practice recognizes that companies

require a certain amount of working capital to conduct normal production activities and to meet

daily payment requirements like material purchases and payroll. *See e.g.*, *Live Swine From*

*Canada*, 70 Fed. Reg. 12,181 (Dep't of Commerce Mar. 11, 2005) (final LTFV determ.), and

accompanying IDM at Comment 2. Consistent with this practice, Commerce allows interest

income earned on working capital to offset expenses in the financial expenses calculation

included in the cost of production.  IDM at 14.  Commerce assumes that working capital interest income derives from the interest on short-term interest-bearing assets.  *See id.* (citing *Certain Frozen Warmwater Shrimp from Thailand*, 74 Fed. Reg. 47,551 (Dep't of Commerce Sept. 16, 2009) (final admin. review)).  Accordingly, because short-term interest-bearing assets are presumed to be in a company's current operations account and thus readily available for day-to-day cash requirements, a respondent may use the interest income earned on a short-term interest-bearing asset to offset financial expenses.  *Id.*  This practice has been repeatedly affirmed both by this Court and the Federal Circuit.  *See, e.g.*, *Pakfood Pub. Co. Ltd. v. United States*, 453 F. App'x 986, 989-90 (Fed. Cir. 2011) (unpublished); *Pakfood Pub. Co. Ltd. v. United States*, 724 F. Supp. 2d 1327, 1353-58 (Ct. Int'l Trade 2010); *Hyundai Elecs. Indus. Co., Ltd. v. United States*, 342 F. Supp. 2d 1141, 1161 (Ct. Int'l Trade 2004); *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230, 1239 (Ct. Int'l Trade 1997); *NTN Bearing Corp. of America v. United States*, 905 F. Supp. 1083, 1096 (Ct. Int'l Trade 1995).  However, the "burden of proof" is squarely on the "the respondent to substantiate and document the nature of accounts when making a claim for an offset, and Commerce will not allow an offset when a respondent cannot demonstrate that the interest income in question is short-term in nature."  *Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. v. United States*, 651 F. Supp. 3d 1348, 1364 (Ct. Int'l Trade 2023).

    Although Megaa Moda agrees with this description of Commerce's practice, nonetheless, Megaa Moda now contends that Commerce's determination in this review is inconsistent with Commerce's well-established practice.  Megaa Moda Br. at 8-12.  In other words, Megaa Moda maintains that Commerce is mistaken to think that the interest subvention was *not* generated from Megaa Moda's working capital accounts, characterizing the subvention income as relating to the refund of interest expenses that have been paid on certain exporting financing loans.  *Id.* at

9-10.  As support, Megaa Moda spends much of its brief identifying various places in the record and asserting that the information identified demonstrates the short-term nature of the income earned from the interest subvention program.  *See, e.g.*, *id.* at 9 (website screenshot explaining loans); *id.* at 10 (regulations governing subvention program).  Megaa Moda also attaches various record excerpts that Commerce has already considered and relied upon in deciding to deny the interest subvention income offset in the underlying administrative decision.  *Id.* at 11-12.

Nevertheless, Megaa Moda's argument fundamentally misunderstands Commerce's analysis of what constitutes short-term interest income.  As explained above and as Commerce explained in the final results, interest income is short-term "*if generated from the company's current assets and working capital accounts*."  IDM at 14 (emphasis added).  Indeed, in Section D of the initial questionnaire, Megaa Moda was instructed,

> In calculating net interest expense for {cost of production} and {constructed value}, include interest expense relating to both long- and short-term borrowings made by your company.  Reduce the amount of interest expense incurred by any interest income earned by your company on *short-term investments of its working capital*. Demonstrate the short-term nature of the short-term interest.

Megaa Moda DQR at D-41 (emphasis added).  Megaa Moda now argues that the packing credit loans were part of its working capital.  *See* Megaa Moda Br. at 9 ("packing credit can also be extended as working capital assistance to meet expenses such as wages, utility payments, travel, expenses, etc.").  Megaa Moda further argues that the interest payments it made on these loans constituted interest expenses.  *Id.*  Finally, Megaa Moda argues that refunds it received for some of its interest payments on those loans constituted short-term interest income.  *Id.* at 9-10.

However, Megaa Moda's arguments fail when viewed in light of Commerce's analysis. For example, the packing credit loans are not generating income for Megaa Moda; they are a

liability.  *Id.* at 10 ("interest expenses **paid** on the short-term packing credit loans) (emphasis in original).  Further, Megaa Moda is simply receiving refunds for what is essentially an *overpayment* of the interest owed.  *Id.* ("some of those interest expenses were **refunded**") (emphasis in original).  Despite Megaa Moda's statement that "it is axiomatic that such subvention necessarily also related to {Megaa Moda's} working capital and also were short-term in nature," *id.*, its own explanation of the subvention program cuts against its erroneous notion that interest payment refunds are related to any short-term investment of its working capital, *id.*, and supports Commerce's determination to deny the subvention offset.  IDM at 13-14.

Nor does the "time limitation" for realization of export proceeds substantiate the short-term nature of the loans and interest subvention received.  *See* Megaa Moda Br. at 10.  Even if these loans are quick to be settled, as Megaa Moda argues, the funds to pay the interest are committed, therefore, the funds cannot be used to meet the company's daily cashflow requirements.  As explained above, interest income is short term in nature only if the underlying asset, in this case the interest payments, is liquid enough to meet the company's daily cashflow requirements.  *Apex Exps. v. United States*, 37 C.I.T. 1823, 1828-29 (Ct. Int'l Trade 2013); IDM at 14.  Commerce "determine{d} that this interest subvention was generated from the refund of interest expenses from export credit, not from the company's current assets and working capital accounts."  IDM at 14.  In essence, Megaa Moda is attempting to treat borrowed money, in the form of packing loans, the same as if that money were its own, and then Megaa Moda argues that because it has *overpaid* its interest payments, that the loan has somehow generated money for Megaa Moda.  *See id.*

Lastly, Megaa Moda's reliance on the several attachments appended to its brief is similarly not compelling because Commerce has already examined this information and

determined in the final results that it was unconvincing. *See id.* For example, attachments 1 and 2 identify and itemize Megaa Moda's *interest expenses* on "short-term borrowings," and Megaa Moda highlights the line item for the subvention program. Megaa Moda Br. at 11; *see also* Megaa Moda's Revised Case Br. at Att. 2; Megaa Moda Supp. ABCQR at Exhibit S1-1. Attachments 3 and 4 identify and itemize Megaa Moda's *total* short-term borrowings, and Megaa Moda highlights the line item for the packaging credit loans. Megaa Moda Br. at 11; *see also* Megaa Moda's Revised Case Br. at Att. 4; Megaa Moda Supp. ABCQR at Exhibit S1-1.

In any event, the only facts these attachments demonstrate is Megaa Moda's incurred short term liabilities, interest paid, and interest refunded. *See* Megaa Moda Br. at 11. In Section D of the initial questionnaire, Commerce instructed respondents to "reduce the amount of interest expense incurred by any interest income earned by your company on short-term investments of its working capital." Initial Questionnaire at D-15. These attachments do not demonstrate that the loans were *invested* or somehow *generated* interest income; they are only excerpts of record evidence that Commerce has already considered in its determination to deny the interest subvention offset. IDM at 14. The refunds that Megaa Moda received may be related to the packing credit loans, but not necessarily in the manner for Commerce to lawfully grant Megaa Moda a short-term interest income offset, *i.e.*, the refunds were not generated by Megaa Moda's assets or investments of its working capital. *See id.*

Finally, Megaa Moda cannot argue, given the record, that it should be entitled to a short-term interest income offset for the interest subvention program because it cannot demonstrate that it has earned any short-term interest income. *Id.* In denying the requested offset, Commerce appropriately found that the interest subvention was generated from the refund of interest expenses from export credit, *not* from the company's current assets and working capital

accounts. *Id.* Thus, following its well-established practice, Commerce denied the offset, and this determination is supported by substantial evidence. *See id.*; *Jiangsu*, 651 F. Supp. 3d at 1364.

  B. Substantial Evidence Supports Commerce's Determination To Exclude The Portion Of The Interest Income Offset Related To Interest On "FD with FBL"

Commerce also reasonably excluded Megaa Moda's claimed "interest on FD with FBL" interest income offset. IDM at 14. Commerce found that Megaa Moda did not satisfy its burden of proof to demonstrate the short-term nature of the interest income, and thus could not substantiate its request for an offset. *Id.*; *see also Jiangsu*, 651 F. Supp. 3d at 1364. Further, nowhere in Megaa Moda's reporting did Megaa Moda even *define* what "FD with FBL" refers to. *See generally* Megaa Moda AQR (P.R. 115-117, C.R. 36-40); Megaa Moda BCQR (P.R. 118-127, C.R. 52-58); Megaa Moda DQR (P.R. 129-31, C.R. 63-66); Megaa Moda Supp. ABCQR (P.R. 149-50, C.R. 82-86); Megaa Moda SDQR (P.R. 153-55, C.R. 90-94). As the party making a claim and in possession of information needed to support the claim, Megaa Moda was responsible for demonstrating the short-term nature of the interest income offset and it failed to do so. *Id.*; *see also QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (holding that parties, not Commerce, have the burden of building the record); *Jiangsu*, 651 F. Supp. 3d at 1364.

Commerce determined in the preliminary results and continued to determine in the final results that Megaa Moda failed to fulfill its evidentiary burden to demonstrate the short-term nature of the interest income on "FD with FBL" because Megaa Moda did not provide supporting documentation after being specifically asked. *See* PDM at 13; IDM at 14. Nevertheless, Megaa Moda challenges this determination. Its challenge is two-fold. First, Megaa Moda claims that the administrative record "already fully supported the treatment of

Megaa Moda's interest income on FD with FBL as short-term in nature."  Megaa Moda Br. at

13.  Second, Megaa Moda argues that Commerce's practice militates toward finding that the

income interest on "FD with FBL" is short term in nature.  *Id.* at 13-14.  Megaa Moda's

arguments necessarily fail.

As Commerce explained in the final results, Commerce specifically asked Megaa Moda

to demonstrate the short-term nature of the interest income offset.  Supp. DQ at 8 (P.R. 140, C.R.

76).  However, Megaa Moda did not even define "FD with FBL," let alone provide supporting

documentation.  *See* Megaa Moda SDQR at SD1-21 (P.R. 153, C.R. 90).  Nor does Megaa Moda

even belatedly explain what "FD with FBL" stands for in its brief to this Court.  *See generally*

Megaa Moda Br.  Thus, in the instant case, Megaa Moda did not fully substantiate the interest

income offset, as Commerce requested.  IDM at 14.

In addition, Megaa Moda's cite to *Glycine from India* does not support its claim.  Megaa

Moda Br. at 14 (citing *Glycine from India*, 84 Fed. Reg. 18,487 (Dep't of Commerce May 1,

2019) (final LTFV determ.), and accompanying IDM at Comment 3).  In that case, the

respondent classified fixed deposits and value-added tax payments that generated interest

income, as "cash and cash equivalents," and in doing so, the respondent fully substantiated its

requested short term interest income offset.  Although Megaa Moda erroneously argues that "the

same situation existed, and it was lawfully incorrect for Commerce not to have adopted the same

approach in this case and treat the interest income on FD with FBL as an appropriate offset to

financial expenses," *id.*, Megaa Moda glosses over that *none* of Megaa Moda's submissions at

the administrative stages nor the attachments to Megaa Moda's brief even define "FD with

FBL," let alone provide supporting documentation for it.  Commerce, therefore, reasonably

denied Megaa Moda's requested interest income offset for interest on "FD with FBL." IDM at

14.

IV.    Substantial Evidence Supports Commerce's Calculation Of The Rate For Companies Not
       Selected For Individual Review

Finally, AHSTAC argues that because Commerce allegedly "erred in determining Megaa

Moda's weighted-average dumping margin, the margin assigned to the non-selected companies

under review also requires revision as this margin was determined, in part, on the margin

calculated for Megaa Moda." AHSTAC Br. at 23.

Although we agree that Commerce would be statutorily obligated to recalculate the rate

assigned to companies not selected for individual review if it was required to calculate a new rate

for Megaa Moda, 19 U.S.C. § 1677b(a), in this case, Commerce did not err in determining

Megaa Moda's weighted-average dumping margin because its determination to rely on all of

Megaa Moda's reported home market sales in calculating normal value is supported by

substantial evidence. *See* IDM at 8-10; *see generally* Proprietary Decision Mem. Therefore, the

margin assigned to non-selected companies under review does not require any revision. *See id.*

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' and plaintiff-

intervenors' motions for judgment upon the agency record, sustain Commerce's final

determination in its entirety, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.

33

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel
For Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-7571
Email: Kara.M.Westercamp@usdoj.gov

Dated: April 16, 2024

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 9,880 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Kara M. Westercamp

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE THOMAS J. AQUILINO, JR., JUDGE

_____

|  |  |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED | ) ) |
| Plaintiff, | ) ) |
| v. | ) |  Consol. Court No. 23-00202 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| MEGAA MODA PRIVATED LIMITED | ) ) |
| Defendant-Intervenor, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, et al., | ) ) ) |
| Defendant-Intervenors. | ) ) |

_____

## **PROPOSED ORDER**

Upon consideration of the motion for judgment upon the agency record filed by plaintiffs, all responses thereto, the administrative record, and other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's final results in this matter are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2024                     _____

New York, NY                                                JUDGE