Slip Op. 24-93

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x  Senior Judge Aquilino
                                        :
AD HOC SHRIMP TRADE ACTION COMMITTEE,
                                        :
              Plaintiff,
                                        :
              -and-
                                        :
AMERICAN SHRIMP PROCESSORS ASSOCIATION,
                                        :
         Intervenor-Plaintiff,
                                        : Consol. Court
              v.                          No. 23-00202
                                        :
UNITED STATES,
                                          PUBLIC VERSION
                                        :
              Defendant,
                                        :
              -and-
                                        :
MEGAA MODA PRIVATE LIMITED,
                                        :
         Intervenor-Defendant.
                                        :
- - - - - - - - - - - - - - - - - - - -x

Opinion & Order

[Granting motion of plaintiff and intervenor-
 plaintiff for judgment on agency record;
 remanded to defendant for reconsideration.]

Dated: August 15, 2024

Nathaniel M. Rickard and Zachary J. Walker, Picard, Kentz & Rowe, LLP, Washington, D.C., for the Ad Hoc Shrimp Trade Action Committee.

Roger B. Schagrin and Nicholas J. Birch, Schagrin Associates, Washington D.C., for the American Shrimp Processors Association.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington,

D.C., for the defendant United States.  With her on the brief <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades. Jr.</u>, Assistant Director.  Of counsel <u>Ruslan Klafehn</u>, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce, Washington, D.C.

<u>Robert G. Gosselink</u>, <u>Aqmar Rahman</u>, and <u>Sezi Erdin</u>, Trade Pacific PLLC, Washington, D.C., for Megaa Moda Private Limited.

AQUILINO, Senior Judge:  Two challenges to <u>Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2021-2022</u>, 88 Fed.Reg. 60431 (Dep't Commerce Sept. 1, 2023) ("<u>Final Results</u>"), P.R. 205, are addressed in this consolidated action, covering the 17th administrative review period February 1, 2021, through January 31, 2022 ("POR").  An issues and decision memorandum ("IDM"), P.R. 202, and a proprietary decision memorandum ("Proprietary Decision Memo"), P.R. 204, C.R. 130, accompany the <u>Final Results</u>.  Ad Hoc Shrimp Trade Action Committee ("AHSTAC"), with the support of American Shrimp Processors Association ("ASPA"), contends the International Trade Administration, U.S. Department of Commerce ("ITA"), improperly included certain sales in its determination of the normal value of respondent Megaa Moda Private Limited ("Megaa Moda") that were allegedly not made for consumption in the home market during the administrative review of the antidumping-duty order.  <u>See</u> Complaint, Court No. 23-00202, ECF No. 6.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 3

In a second action, Megaa Moda contests ITA's refusal to offset its financial expenses with its short term capital interest received.  <u>See</u> Complaint, Court No. 23-00205, ECF No. 5.

For reasons that follow, the <u>Final Results</u> will be remanded in part.

I

Defendant's concise statement of facts relates much of the following.  In April 2022, ITA initiated administrative review of 261 exporters of subject merchandise, including Megaa Moda. <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 87 Fed.Reg. 21619 (Dep't Commerce April 12, 2022), P.R. 12.  Initially, Nekkanti Sea Foods Limited ("Nekkanti") as well as one other prominent exporter were selected as mandatory respondents.  <u>See</u> Respondents Selection Mem., P.R. 34, C.R. 4. After ITA received Nekkanti's responses to its questionnaire, it also received timely submissions withdrawing all review requests for 74 exporters, including the initial mandatory respondent selections.  ITA then selected Megaa Moda and another exporter as mandatory respondents.[1]  <u>See</u> <u>Certain Frozen Warmwater Shrimp From India</u>, 88 Fed.Reg. 13430 (Dep't Commerce March 3, 2023)

---

[1]  That other exporter is not relevant to this opinion.

("<u>Preliminary Results</u>"), P.R. 168), and accompanying preliminary decision memorandum ("PDM") at 2 (Dep't Commerce April 29, 2022), P.R. 159); Add'l Respondents Selection Mem., P.R. 81, C.R. 32.

On July 21, 2022, ITA issued its initial questionnaire to Megaa Moda.  P.R. 82, C.R. 32.  Megaa Moda's timely Section A questionnaire response reported that it had a viable home market and supported this response with a quantity and value chart showing that the volume of sales in the home market was [[          ]] of the volume of sales in the U.S. market.  Megaa Moda Section A Questionnaire Resp. ("AQR") at Exhibit A.1, P.R. 115-17, C.R. 36-41.  In its Section B and C responses, Megaa Moda provided ITA information covering comparison market sales and U.S. sales.  Megaa Moda Section B&C Questionnaire Resp. ("BCQR"), P.R. 118-127, C.R. 52-58.

On December 21, 2022, AHSTAC submitted comments alleging that [[     ]] of Megaa Moda's claimed home market sales (accounting for [[     ]] kilograms of its total home market sales quantity of [[     ]] kilograms) were intended for the export market because the sales were made to [[          ]] and were aberrational compared to Megaa Moda's other home market sales. AHSTAC Comments on Megaa Moda's Resp. to Sections A, B, and C of

the Questionnaire ("AHSTAC Comments on IQR"), P.R. 134, C.R. 73. On January 13, 2023, ITA issued a supplemental questionnaire to Megaa Moda seeking, among other things, clarification of the sales to that customer and Megaa Moda's reason for reporting them as home market sales.  ITA Supplemental Section A-C Questionnaire ("Supp. ABCQ") at 7, P.R. 139, C.R. 75.  In response, Megaa Moda provided sample documentation for transaction "SEQU 76" that showed "the material was destined to be delivered in the domestic market" and "were packed in Unbranded [<u>sic</u>] pouches and cartons which under any situation may not be suitable for U.S. market."  Megaa Moda Supp. ABCQR at 19, P.R. 149-50, C.R. 82-86.  Megaa Moda also provided other documentation that showed the sale was made to a customer in India (located in [[              ]]) with ex-works delivery terms. <u>Id</u>.

        On September 22, 2022, Megaa Moda timely responded to Section D of the Initial Questionnaire.  Megaa Moda Section D Questionnaire Resp. ("DQR"), P.R. 129-31, C.R. 63-66.  In this response, Megaa Moda provided its cost allocation for the POR and its net interest expense ("INTEX[2]") ratio calculation.  <u>Id</u>. at Exhibit D-7 (cost allocation), P.R. 129-130, C.R. 63, and Exhibit

---

        [2]  <u>I.e.</u>, ITA's field name for net interest expense.  <u>See</u>, <u>e.g.</u>, Megaa Moda DQR at D-47.

D-14 (INTEX ratio calculation), P.R. 130, C.R. 64.  Megaa Moda
calculated its INTEX ratio by dividing its net interest expenses by
its cost of the goods sold.  To determine its net interest
expenses, Megaa Moda offset its total interest expenses (related to
both short- and long-term liabilities) by its interest income
related only to short-term assets.  Specifically, Megaa Moda summed
its interest expenses during the POR and offset these expenses with
financial income related to (1) foreign exchange gains, (2)
"interest on FD with FBL", and (3) "interest subvention received".
See id. at Exhibit D-12, P.R. 129, C.R. 63.

     ITA thereafter issued a supplemental Section D
questionnaire asking Megaa Moda to "explain the nature of the
interest subvention received of [[          ]] INR." ITA Supp.
Section D Questionnaire (Jan. 19, 2023) at 8 ("Supp. DQ"), P.R.
140, C.R. 76.  ITA also requested Megaa Moda to "provide supporting
documentation that the interest income offset is derived from
interest income earned on short term assets." Id.  In its (timely)
response, Megaa Moda explained the interest subvention program and
provided the regulations governing that program, a webpage
explaining the nature of the loans underlying the interest refunds,
a bank statement identifying the interest subvention income
received, and screenshots from its accounting system linking the

refunded payments to the bank statement.  Megaa Moda Section D Supp. Questionnaire Resp. ("SDQR") at Exhibits SD1-12 (regulations and webpage), SD1-12(a) (bank statement), and SD-12(b) (screenshots), P.R. 154, C.R. 92.

On March 3, 2023, ITA published its Preliminary Results determining that Megaa Moda had made sales of shrimp at prices below normal value and calculated a preliminary weighted-average dumping margin of 7.92 percent.  Certain Frozen Warmwater Shrimp From India, 88 Fed.Reg. at 13430.  ITA determined that "the aggregate volume of [Megaa Moda's] home market sales of the foreign like product was sufficient to permit a proper comparison with U.S. sales of the subject merchandise", PDM at 9, and it relied on all of Megaa Moda's reported home market sales in its preliminary calculation of normal value.  See PDM at 10, 14.

In doing so, ITA denied Megaa Moda's requested subvention program offset as well as the "interest on FD with FBL"[3] offset claim.  Id. at 13.  Specifically, ITA determined, with regard to the subvention program, that the interest earned did not relate to short-term investments of the company's working capital.  Id.;

---

[3]  According to the defendant, across all of Megaa Moda's record submissions "interest on FD with FBL" was never defined.

<u>Preliminary Results</u> Calculations, P.R. 164, C.R. 105.  With respect to the "interest on FD with FBL" offset claim, ITA determined that Megaa Moda had not provided evidence that the interest was earned on short-term investments of the company's working capital.  <u>Id</u>.

For companies not selected for individual review, as mentioned, ITA calculated a preliminary weighted-average dumping margin of 3.76 percent.  <u>Certain Frozen Warmwater Shrimp From India</u>, 88 Fed.Reg. at 13430.

Megaa Moda and AHSTAC timely filed administrative case and rebuttal briefs.  AHSTAC Case Br., P.R. 172, C.R. 115; Megaa Moda Revised Case Br., P.R. 197. C.R. 127; AHSTAC Rebuttal Case Br., P.R. 176, C.R. 119; Megaa Moda Rebuttal Case Br., P.R. 188, C.R. 124.  ASPA also timely filed a rebuttal brief.  ASPA Rebuttal Br., P.R. 178, C.R. 120.

In its administrative case brief, AHSTAC argued that ITA should have excluded certain of Megaa Moda's home market sales from the calculation of normal value.  AHSTAC's Case Br. at 1-17.  ASPA agreed with AHSTAC on this issue.  ASPA Rebuttal Br. at 1-6.  AHSTAC claimed that a review of the record demonstrates that the sales in question were meant for export, not for consumption in the home market.  AHSTAC Case Br. at 3-14.  AHSTAC also argued that ITA

should apply facts available with an adverse inference as to how to treat those sales because "Megaa Moda's willful inaccurate representations regarding the nature of these home market sales has significantly impacted this proceeding and has, in particular, prevented the Department from developing a meaningful understanding of these sales." Id. at 14. Lastly, AHSTAC argued that because "correcting" the normal value calculation with the change it asserted would have necessarily resulted in a change in the dumping margin, ITA must recalculate the rate assigned to companies not selected for individual review. See id. at 17-18.

In rebuttal, Megaa Moda argued that ITA correctly treated the sales in question as home market sales. Megaa Moda Rebuttal Case Br. at R-4--R-12. It claimed that AHSTAC completely ignored certain parts of the record that support ITA's determination that the sales in question were for consumption in the home market. See id.

In its administrative case brief, Megaa Moda argued that ITA should grant two short term interest income offsets. See Megaa Moda Revised Case Br. With respect to the interest subvention program, Megaa Moda argued that based on record information it had proven the short-term nature of income generated from the interest

subvention program and therefore an offset should have been granted. Id. at 6-9. With respect to "interest on FD with FBL," Megaa Moda again argued that because the income is grouped under cash and cash equivalents in an audited financial statement, ITA should have granted an offset. Id. at 9-13.

In rebuttal, AHSTAC argued that ITA was correct to deny both requested short-term interest income offsets. AHSTAC Rebuttal Case Br. at 1-10. With respect to the interest subvention program, AHSTAC argued that the income generated by the program is not a gain on investments but is rather an export subsidy program that should be separately investigated in a countervailing duty investigation. Id. at 2-8. With respect to the "interest on FD with FBL" claim, AHSTAC argued that Megaa Moda had failed to build an adequate administrative record to support the claimed offset. Id. at 8-10. ASPA additionally argued that the interest the subvention program income generated was not a part of Megaa Moda's working capital assets. ASPA Rebuttal Br. at 7-9. It also argued that ITA was correct in finding that Megaa Moda had not met its burden to support the claimed offset of "interest on FD with FBL." Id. at 10-12.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>    Page 11

On September 1, 2023, ITA published the <u>Final Results</u>, calculating a weighted average dumping margin of 7.92 percent for Megaa Moda. 88 Fed.Reg. at 60432. It continued to rely on all of Megaa Moda's reported home market sales to calculate normal value. IDM at 6-9. ITA explained that, "to determine whether a sale should be included in the home market sales data," its practice is to consider whether the "producer knew or should have known at the time of sale that the merchandise was for consumption in the home market." <u>Id</u>. at 8-9 (citing <u>Certain Lined Paper Products from India: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020–2021</u>, 88 Fed.Reg. 21971 (Dep't Commerce April 12, 2023) ("<u>Lined Paper from India</u>") and accompanying issues and decision memorandum ("I&D Memo") at Comment 1. In applying that standard, ITA claims to have assessed "documentary or physical evidence" and determined that there was no evidence on the record that Megaa Moda had knowledge at the time of the certain sales that those sales were destined for export. <u>Id</u>. at 9; <u>see</u> <u>also</u> Proprietary Decision Memo.[4]

---

[4]    ITA generated this document concurrently with the IDM and other disclosure documents because the arguments raised by AHSTAC and ASPA in their respective case and rebuttal briefs relied extensively on business proprietary information. <u>See</u> IDM at 6 n.27.

Consol. Court No. 23-00202     <u>PUBLIC</u> <u>VERSION</u>                    Page 12

ITA also continued to deny Megaa Moda's requested interest subvention program offset, consistent with its "well-established practice". IDM at 13-14. ITA explained that, based on Megaa Moda's explanation of the program, it determined that the interest subvention was generated from the refund of interest expenses from export credit, not from Megaa Moda's current assets and working capital accounts. <u>Id</u>.

Next, ITA continued to deny Megaa Moda's requested interest on "FD with FBL" offset claim. <u>Id</u>. at 14. It explained that it had specifically asked Megaa Moda to demonstrate the short-term nature of the interest income offset and found that because Megaa Moda did not provide supporting documentation for the short-term nature of the interest income offset purportedly derived from interest on "FD with FBL", Megaa Moda did not fully substantiate the interest income offset and, therefore, was not entitled to it. <u>Id</u>.

Finally, ITA calculated a weighted average dumping margin of 3.88 percent for companies not selected for individual review. <u>Id</u>. at 4; <u>Certain Frozen Warmwater Shrimp From India</u>, 88 Fed.Reg. at 60432.

II

Both complaints predicate jurisdiction herein on 28 U.S.C. §1581(c), which confers this Court's exclusive jurisdiction to review ITA final antidumping-duty determinations under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).

By statute, such actions require judicial review for "substantial evidence on the record", 19 U.S.C. §1516a(b)(1)(B), as compiled by ITA, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion", in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed.Cir. 1984) (footnote omitted).

"At least once during each 12-month period" from the date an antidumping-duty order is published, ITA must review the dumping margin of imported merchandise subject to that order. 19 U.S.C. §1675(a)(1). In this consolidated action, the margin is the amount by which the "normal value" of subject merchandise exceeds its "export price." See 19 U.S.C. §1677(35)(A)[5]. While "export price"

_____

[5]    See also 19 U.S.C. §1673 ("there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty
(continued...)

is the agreed-upon price at which the subject merchandise is sold,
19 U.S.C. §1677a, the statute provides three methods for
determining normal value.  ITA's default method is the average
price of the "foreign like product"[6] sold for consumption in the
respondent's home market.  19 U.S.C. §1677b(a)(1)(B)(i).  If the
home market is not viable (i.e., is less than five percent of
aggregate U.S. sales), ITA may instead average the prices of the
merchandise in a third country.  19 U.S.C. §1677b(a)(1)(C).

In that consideration of pricing, if questions arise over
a respondent's characterization of particular sales (as either
export or home market), ITA tests the extent to which the
respondent "knew or should have known" that its sales are "for
export" or "for consumption" in the home market, depending on the
question of disposition raised.  See, e.g., Allegheny Ludlum Corp.
v. United States, 24 CIT 1424, 1433-34, 215 F.Supp.2d 1322, 1330-31
(2000) and cases cited.[7]  And "[w]hile the burden of creating an

---

[5]    (...continued)
imposed, in an amount equal to the amount by which the normal value
exceeds the export price (or the constructed export price) for the
merchandise"); see, e.g., U.S. Steel Corp. v. United States, 621
F.3d 1351, 1353 (Fed.Cir. 2010) (citing 19 U.S.C. §1677(35)(A)).

[6]    See 19 U.S.C. §1677(16) (definition).

[7]    ITA's knowledge tests for exportation and normal value
appear confusing at times.  See, e.g., LG Semicon Co. v. United
(continued...)

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 15

adequate record lies with [interested parties, ITA] must, nonetheless, support its decision with substantial evidence." <u>SeAH Steel VINA Corp. v. United States</u>, 950 F.3d 833, 847 (Fed.Cir. 2020), citing <u>QVD Food Co. v. United States</u>, 658 F.3d 1318, 1324 (Fed.Cir. 2011). That is, "[t]o the extent that [ITA] finds relevant information missing from the record, it is incumbent on [ITA] to solicit that information from the party in possession of the information". <u>Nucor Corp. v. United States</u>, 47 CIT ___, ___, 653 F.Supp.3d 1295, 1310 (2023), citing <u>Ta Chen Stainless Steel Pipe, Inc. v. United States</u>, 298 F.3d 1330, 1336 (Fed.Cir. 2002).

    As for respondents not selected for individual review, ITA generally looks to the statutory "all others" rate in investigations for guidance. <u>See</u> 19 U.S.C. §1673d(c)(5)(A); <u>see</u>,

_____

        [7]  (...continued)
<u>States</u>, 23 CIT 1074 (1999) (relying on legislative history to support finding that the respondent "knew or should have known" that merchandise it sold was destined for the United States); <u>compare</u> <u>INA Walzlager Schaeffler KG</u>, 21 CIT 110, 123-24, 957 F.Supp. at 263-64 (2020) (in implementing 19 U.S.C. §1677b(a), ITA examines sales within the home market database for the producer's knowledge of whether it "knew or should have known that the merchandise was . . . for home consumption based upon the particular facts and circumstances of the case") <u>with</u> <u>Coalition of American Flange Producers v. United States</u>, 44 CIT ___, ___, 448 F.Supp.3d 1340, 1354 (2020) (in implementing 19 U.S.C. §1677b(a), "a producer need not know the final destination of merchandise sold so long as the producer has actual or constructive knowledge it will be exported outside the home market").

e.g., Albemarle Corp. v. United States, 821 F.3d 1345, 1352 (Fed.Cir. 2016) ("the statutory framework contemplates that [ITA] will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations"). Based thereon, ITA generally assigns non-selected respondents the weighted average of the dumping margins determined for individually-examined companies, excluding any zero and de minimis margins and margins determined entirely on the basis of facts available. See 19 U.S.C. §1677e.

III

AHSTAC's complaint claims that ITA improperly included sales not made "for consumption" in Megaa Moda's home market of India when determining "normal value" sales. Complaint, Court No. 23-00202, ¶¶ 15-19. If substantiated, the claim would impact both Megaa Moda's margin and the margin assigned to the non-selected companies subject to the review. See id. ¶¶ 20-22.

A

Megaa Moda's Section A response stated that its home market sales were usable as a basis for normal value because the volume of those sales during the POR was more than five percent of

the volume of its sales to the United States.[8]  Megaa Moda AQR at

A-3.  Megaa Moda included a table reporting the quantity and value

of its sales in the home market and the United States.  Id. at

Exhibit A.1.  This information indicated that Megaa Moda sold

[[      ]] kilograms in the home market compared to [[      ]]

kilograms to the United States market and was the basis for Megaa

Moda's claim that its home market shipments were [[    ]] percent

of its shipments to the United States by volume, or [[

]][9].  See id.

_____

[8]    ITA generally considers sales in the home market to be an
appropriate basis for determining normal value "if the Secretary is
satisfied that sales of the foreign like product . . . are of
sufficient quantity."  19 C.F.R. §351.404(b)(1).  "'Sufficient
quantity' normally means that the aggregate quantity (or, if
quantity is not appropriate, value) of the foreign like product
sold by an exporter or producer in a country is 5 percent or more
of the aggregate quantity (or value) of its sales of the subject
merchandise to the United States."  Id., §351.404(b)(2).

[9]    Megaa Moda's Section B response further informed as to
its home market shipments.  See Megaa Moda BCQR.  In that response,
Megaa Moda assigned each home market sales record a unique
sequential number (i.e., "sequence number" or "SEQH").  See id. at
B-10--B-11, P.R. 118, C.R. 52.  For each sales observation, Megaa
Moda reported transaction specific information, including the sale
invoice number, type of shrimp product sold (including packaging),
customer name, and place of delivery.  See, e.g., id. at Exhibit
B.1 (sample printout of Megaa Moda's home market sales database).

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 18

AHSTAC took issue with Megaa Moda's initial questionnaire response, specifically as to certain comparison market sales that Megaa Moda reported as having been made "for consumption" in its home market.  <u>See</u> AHSTAC Comments on IQR at 9-13.  In its comments, AHSTAC noted that [[                    ]] home market sales observations reported by Megaa Moda accounted for [[

      ]] of the respondent's home market sales by quantity and that the [[    ]] sales observations correspond to [[

                          ]] that were each made to [[

              ]].  <u>Id</u>. at 9.

Prior to [[





                          ]].  Given that [[



                  ]], AHSTAC's comments therefor asked ITA to further inquire whether Megaa Moda knew or should have known that its sales to [[        ]] were not sold for consumption in the home market.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                    Page 19

        AHSTAC's comments on Megaa Moda's home market sales
further described the various ways in which Megaa Moda's sales to
[[          ]] were apparently aberrational compared to the other
home market sales reported by the company.  <u>See</u> AHSTAC Comments on
IQR at 9-10.  For example, the [[          ]] home market sales
observations that seem to correspond to [[

                                        ]] compared to [[

                                        ]] home market sales
observations reported by Megaa Moda.  <u>Id</u>. at 9.  AHSTAC also
highlighted the fact that the [[                    ]] reported by
Megaa Moda for its sales to [[        ]] corresponded to a [[


                                        ]].  <u>Id</u>. at 11-12 (citations
omitted).

        ITA's January 13, 2023 supplemental questionnaire to
Megaa Moda sought additional information on the company's sales to
[[          ]] and an explanation as to why it believed such sales
"were for consumption in India, rather than for export to another
market."  Supp. ABCQ at 7.  ITA specifically asked Megaa Moda the
following:

> The vast majority of your home market sales were to [[                          ]]. Provide a detailed explanation of why you believe your sales of shrimp to [[        ]] were for consumption in India, rather than for export to another market.

Id. In response, Megaa Moda stated that it

> is submitting sample documentation for SEQU 76 pertaining to sales made to [[        ]] as Exhibit S1-8. From purchase order (Page-1) it can be seen that the destination of the sale is [[            ]]. From the copy of Tax Invoice (Page-2) it can be seen that the place of delivery is [[                          ]]. From e-way bill it can also be seen that the place of delivery is [[                          ]]. Thus, from all the three documentation it can be seen that the material was destined to be delivered in the domestic market. Further the order was Ex-works [sic] and the material was picked by the customer. As the material was delivered in India and was also destined in India, Megaa classified the same as domestic sales. Megaa has no indication, knowledge or documentation to suggest that the material was destined to be consumed in export market. Moreover, the goods were packed in Unbranded [sic] pouches and cartons which under any situation may not be suitable for U.S. market. So we can safely say that goods were sold domestically in India.

Megaa Moda Supp. ABCQR at 13-14. Megaa Moda also provided documentation that included customer correspondence, a tax invoice, an e-way bill, accounting records showing the recording of the sale, and payment documentation. Id. The information confirmed that Megaa Moda made the sale to [[        ]], a customer in India (i.e., in [[            ]]), with ex-works delivery terms. Id.

Here, at this point in the narrative, AHSTAC interjects that Megaa Moda's response to ITA did not address the differences AHSTAC highlighted between Megaa Moda's sales to [[

]] or why it was reasonable for Megaa Moda to believe that the merchandise it sold in "unbranded pouches and cartons" was consumed in the home market.  See Megaa Moda Supp. ABCQR.  AHSTAC also points out that Megaa Moda did not acknowledge that the sales documentation submitted as part of its supplemental response showed that [[

]].  Compare id. at Exhibit S1-8, P.R. 150, C.R. 83 (tax invoice for sale to [[

]]), with Megaa Moda AQR at Exhibit A.8 ([[

]]), P.R. 116, C.R. 37.

ITA's Preliminary Results used the complete universe of Megaa Moda's reported home market sales as the basis for normal value, see PDM at 9-10, and ultimately calculated a preliminary weighted-average dumping margin of 7.92 percent for Megaa Moda.  88 Fed.Reg. at 13431.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                    Page 22

AHSTAC's case brief argued <u>inter</u> <u>alia</u> that ITA's determination of the normal value of Megaa Moda's merchandise should be revised to exclude certain home market sales (i.e., [[

]]) (hereinafter the "contested sales") that AHSTAC contends were not made for consumption in India.  AHSTAC Case Br. at 3-14.  ASPA also submitted written argument drawing further attention to record evidence showing that Megaa Moda knew, or at the very least should have known, that the contested sales were not for consumption in the home market.  ASPA Rebuttal Br. at 1-6.  Agreeing with AHSTAC, ASPA argued that the contested sales could not be used to determine normal value for Megaa Moda.  <u>Id</u>. at 6.  AHSTAC's and ASPA's arguments compared and analyzed the tax invoices on the record and argued that the [[

]] demonstrated that the respondent knew or should have known that the contested sales were destined for export.  AHSTAC Case Br. at 10-14; ASPA Rebuttal Br. at 4-5.

In its rebuttal brief, Megaa Moda disputed that it knew or should have known that the contested sales were not for consumption in the home market.  <u>See</u> Megaa Moda Rebuttal Br.  Megaa Moda's rebuttal focused on the fact that "the material was delivered in India" and packaged in "unbranded pouches and

cartons." Id. at R-5. It also claimed that sales of "unbranded shrimp" are exempted from GST. Id. at R-9--R-11.[10]

ITA's Final Results rejected AHSTAC's and ASPA's arguments that Megaa Moda's sales to [[        ]] should not be considered a part of normal value. See IDM at Comments 3 & 4; see also Proprietary Decision Memo. The agency concluded "no evidence" on the record that "Megaa Moda knew or should have known that certain of its home market sales of shrimp were not sold for consumption in India." IDM at 8-9; see also id. at 9 (asserting "no evidence that Megaa Moda had knowledge at the time of sale these sales were destined for export").

ITA's analysis reasoned that this Court has held that the "trade patterns" of a company's customers do not provide an adequate basis for establishing that sales to such customers are not representative[11]; that the record "[s]pecifically" shows that "(1) the destination of these sales was a location in India; and

---

[10] The sole support on the administrative record for Megaa Moda's claim that GSTs are only charged on "branded" shrimp and scrap is its own declarations. No citation to the governing Indian law or regulation is provided on the record of this proceeding to support that rejoinder. See Megaa Moda Rebuttal Br. at R-9--R-11.

[11] Id. at 9, citing Z.A. Sea Foods Pvt. Ltd. v. United States, 46 CIT ___, ___, 569 F.Supp.3d 1338, 1351 (2022), remand results sustained, 48 CIT ___, 606 F.Supp.3d 1335, aff'd, 2024 WL 2873428 (Fed.Cir. 2024) (not reported in Federal Reporter).

[that] (2) there was no specific packaging or labeling for these sales indicating that they were destined for export." Id. Accordingly, ITA continued to rely on all of Megaa Moda's reported home market sales as the basis for normal value. Id.

ITA thus made no change to the margin calculated for Megaa Moda in the Final Results. Accordingly, the agency continued to assign the company a weighted-average dumping margin of 7.92 percent. That rate was then used to calculate one for firms not selected for individual review.

B

ITA concluded for the Final Results that Megaa Moda neither knew nor should have known that certain of its sales to a customer [[          ]] were being exported to the United States because Megaa Moda claimed that it did not have actual knowledge, and ITA's examination of the evidence led it to finding that there was neither actual nor constructive knowledge that certain sales were being exported to the United States. See IDM at 8-9; Proprietary Decision Mem. at 3-5. ITA therefore relied on all of Megaa Moda's claimed home market sales for the calculation of normal value.

ITA thus determined that Megaa Moda met the "five percent" baseline of minimal home market sales volume necessary for determining normal value. <u>See</u> 19 C.F.R. §351.404(b)(1). AHSTAC targets that determination by contending the proper reading of the record is that Megaa Moda knew or should have known that the contested sales were not "for consumption" in India's domestic market but would be exported, and that those home market sales should therefore have been excluded from the calculation of normal value. Pl's Br. at 13-18. AHSTAC also argues that ITA improperly rejected documentary evidence showing that Megaa Moda must have certainly known or should have known that its sales to [[       ]] were not meant for consumption in the domestic market. <u>Id</u>. at 18-23. This information included the following:

• The tax invoice included with the sample sales documents that Megaa Moda provided for SEQH 76 in response to ITA's request shows that Megaa Moda [[


]][12], which is obviously unlike Megaa Moda's other domestic market sales[13], and rather like sales documents relating to Megaa Moda's sales to purchasers in the United States showing that [[

---

[12]    <u>See</u> Megaa Moda Supp. ABCQR at Exhibit S1-8.

[13]    <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at Exhibits S1-6 (tax invoice showing the [[                           ]]) and S1-7 (tax invoice showing the [[                ]]); Megaa Moda BCQR at Exhibit B.5.b (tax invoice showing the [[                              ]]).

]][14].

• The contested sales were made to a particular customer that ITA acknowledged was an exporter[15], while home market sales to all other home market customers [[                              ]]; in other words, despite Megaa Moda's contention that sales of "unbranded shrimp" are exempted from GSTs[16], the very fact that [[                              ]] indicates that these taxes are collected based on where the shrimp is to be consumed, with "unbranded shrimp" treated as if it were to be consumed elsewhere, outside of India.

• In addition, the [[

---

[14] For example, Megaa Moda invoice number MMPL/2122/ISL044 identifies the United States as the "country of final destination" and includes a note stating "Supply Meant for Export Under Bond or Letter of Undertaking without Payment of Integrated Tax (IGST)". <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at Exhibit C.6.b, P.R. 120, C.R. 54. The related packing list includes the same "supply meant for export" language exempting Megaa Moda from payment of domestic consumption taxes. <u>Id</u>. In addition to the language expressly stating that payment of IGST is not required for export sales, the commercial invoice itself [[                              ]]. <u>Id</u>.; <u>see also</u> Section A Response at Exhibit A.7 (sample U.S. market sales documents with invoice language stating "Supply Meant for Export Under Bond or Letter of Undertaking without Payment of Integrated Tax (IGST)"), P.R. 115, C.R. 36. Thus, according to AHSTAC, invoices prepared by Megaa Moda in the ordinary course of business and on the record of this matter show that the company [[

                              ]]. The tax invoice associated with SEQH 76 (<u>i</u>.<u>e</u>., [[                              ]]) is unique from other tax invoices relating to home market sales on the record herein because it [[                              ]].

[15] IDM at 9.

[16] <u>See</u> Megaa Moda Rebuttal Br. at R-3.

                                      ]], which at
the very least indicates that Megaa Moda must have been
clearly aware that its sales to [[        ]] were unlike
the [[                ]] of the company's sales to other
customers in the home market.

• The contested sales were the [[    ]] sales of product
sold in [[                ]] in the home market, whereas
[[        ]] home market sales reported by Megaa Moda
were of [[
        ]], so the [[            ]] of Megaa Moda's sales
to [[      ]] was entirely dissimilar to any other home
market sale.

• Noteworthy also is that the contested sales were the
only sales of [[                        ]] in the home
market; therefore, because all the other [[    ]] home
market sales observations report [[
                ]][17], and since Megaa Moda reported [[
                        ]] to customers in the
United States[18], similar to the [[

                                      ]] not
only in terms of volume but consisting of [[

                        ]], the inference from these
circumstances should be obvious.

• AHSTAC further contended that the documentation for one
of the contested sales shows that it was [[
                        ]], which
therefore provided Megaa Moda with knowledge that its
customer was [[

                        ]]. AHSTAC
here argues there is no rational explanation on the
record for why it would be reasonable to believe that
sales made to a [[

---

    [17]  <u>See</u> Home Market Sales Database ([[    ]] field).

    [18]  <u>See</u> U.S. Market Sales Database ([[    ]] field).

                     ]] were for consumption in the home market.

AHSTAC 56.2 Br. at 14–18.

      Here summarizing defendant's main position:

• The record evidence demonstrated that [[          ]] were not applicable to domestic sales of unbranded shrimp such that imputing knowledge to Megaa Moda that its sales were meant for export to the U.S. would be unreasonable.

• Because [[

                          ]], the fact that [[          ]] was an exporter was not sufficient to impute knowledge to Megaa Moda that its sales to [[          ]] were meant for export to the U.S.

• Given [[                                ]], the volume sold to [[          ]] was not aberrational such that it would be improper to impute knowledge to Megaa Moda that its sales were meant for export to the U.S.

• Given that Megaa Moda made sales to the U.S. of both [[                    ]] and [[                              ]] shrimp, imputing knowledge to Megaa Moda that its [[                              ]] were meant for export to the U.S. would be unreasonable.

• Imputing knowledge to Megaa Moda based on its U.S. sales of [[              ]] shrimp would be unreasonable.

• The use of a [[                      ]] with the word "[[          ]]" was insufficient to impute knowledge to Megaa Moda that its sales were meant for export to the U.S. when the facilitated sales were made to an Indian company at an Indian address.

Def's Resp. at 14-25.

Megaa Moda also contends:

• It had no reason to believe that any of its domestic sales would not be consumed in India; AHSTAC has not identified sufficient evidence that would have allowed ITA to substantiate the allegation that Megaa Moda knew or should have known that that was not the case.

• It recorded the contested sales as domestic sales in its normal books and records.

• Under long-standing ITA practice, merchandise sold to a market, even if ultimately destined for export, is "consumed" in the market if it is used there to produce non-subject merchandise prior to exportation.[19]

Megaa Moda Resp. at 9-16.

C

Considering the parties' points as a whole, the court concludes that remand of the matter is necessary. The main question here is whether substantial evidence supports ITA's determination on whether Megaa Moda knew or should have known the final disposition of the contested sales at the time they were

---

[19] **Megaa Moda Resp. at 9, referencing <u>inter alia Final Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Corrosion Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate From Korea</u>, 58 Fed.Reg. 37176, 37182 (Dep't Commerce July 9, 1993), and <u>Final Determination of Sales at less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above From the Republic of Korea</u>, 58 Fed.Reg. 15467, 15473 (Dep't Commerce March 23, 1993) ("where a product within the scope of an investigation has been transformed into a product outside that scope before exportation, we consider that product to have been 'consumed' within the country").**

Consol. Court No. 23-00202        PUBLIC VERSION                Page 30

transacted, i.e, in accordance with ITA's knowledge test.  If the record supported a conclusion on the final destination of the contested sales, either "for consumption" or "for export," that determination would go far towards settling this matter.  However, evidence that would definitively resolve that issue is missing from the record.  Therefore, the question of what Megaa Moda knew or should have known with respect to whether the contested sales were "for consumption" or "for export" cannot be concluded.

ITA accepted Megaa Moda's certification of the contested sales, but, when it applied its knowledge test(s), it did not explicitly apply 19 U.S.C. §1677e (determination on the basis of facts available), it implicitly determined that the contested sales were indeed "for consumption" in India.  It is an open question whether proper application of that §1677e would have yielded a satisfactory answer; AHSTAC, at any rate, persuades that ITA's assumption is not based on or amounts to substantial evidence, and the matter must therefore be remanded to ITA for further proceedings consistent with this opinion, which may include re-opening the administrative record for additional fact finding.

ITA explains in its IDM that its "general practice in conducting the 'knowledge test' is to consider documentary or

physical evidence that the producer knew or should have known at the time of sale that the merchandise was for consumption in the home market[,] because this type of evidence is more probative, reliable, and verifiable than unsubstantiated statements or declarations." IDM at 8-9, citing Lined Paper from India, 88 Fed.Reg. 21971, and accompanying I&D Memo at Comment 1. To ITA, the record shows that Megaa Moda sold shrimp in the home market to a domestic customer that is also an exporter, "but nothing indicates that Megaa Moda's sales to this customer were not for consumption in India." Id. at 9.

The latter statement does not fully address AHSTAC's arguments with respect to ITA's "knowledge test". Moreover, it is inaccurate to state that there is "nothing to indicate[ ] that Megaa Moda's sales to this customer were not for consumption in India." AHSTAC's recounting, taken as a whole, of the documentary record, provides sufficient circumstantial indication that it would be unreasonable to conclude, without more, that the contested sales were "for consumption" in India. On that basis, it is likewise questionable whether Megaa Moda's position that it neither knew nor should have known that the contested sales were or might have been destined for export was reasonable, notwithstanding its normal accounting of the contested sales in its books and records.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                    Page 32

First off, the IDM points out (at page 9) that this Court "has held that the trade patterns of a company's customers do not provide an adequate basis for establishing that sales to such customers are not representative", <u>see</u> <u>Z.A. Foods Private Limited</u> <u>v. United States</u>, 46 CIT ___, 569 F.Supp.3d 1338 (2022) ("<u>ZASF I</u>"), which is not this case, as it would be unreasonable to entirely disregard Megaa Moda's certain knowledge of the business of the particular customer of the contested sales, a larger competitor whose operations overwhelmingly consist of shrimp exportation.

Along that line, ITA implies that because [[



]], that statement necessarily means that the contested sales were not exported -- and yet, at the same time, ITA's Proprietary Memo for the IDM separately acknowledged AHSTAC's assertion that [[

]].  <u>See</u> Proprietary Decision Memo at 2.  ITA's discussion does not provide a rational resolution of this apparently contradictory information of record.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>               Page 33

ITA also states that it found [[

]] "not to be significant" because a [[

]].   <u>Id</u>. at 4 (emphasis added).   The logical inference ITA would have the reader draw here is that [[                                      ]] was still of greater significance than Megaa Moda's.

The record is sparse in this regard, but what data there are do not support this inference.  Megaa Moda reported total home market sales amounting to USD [[

]].  Megaa Moda AQR at Exhibit A.1.  It is also clear that the contested sales account for the "vast majority" ([[                    ]]) of Megaa Moda's home market sales during the POR.  By contrast, [[

Consol. Court No. 23-00202    <u>PUBLIC VERSION</u>                Page 34

                                                            ]]

Assuming the average INR to USD conversion rate[20] for 2021 was

1:0.01353, those INR amounts convert to USD [[        ]] and USD

[[        ]], respectively.  This implies that, if the entirety of

[[        ]]'s domestic market sales for [[        ]] had consisted

of the contested sales, then the contested sales would have been

sold at a loss in excess of 90% as compared with the price paid to

Megaa Moda.  The contested sales fell into the [[

                    ]][21], but, as mentioned, [[




            ]].  <u>See</u> <u>id</u>.


        Nonetheless, Megaa Moda and ITA claim that [[        ]]'s

production of breaded shrimp "might" account for the contested

sales.  If that is the case, it is not discernible from the record.

The claim is thus speculative, which is not substantial evidence.

_____

        [20]    <u>See</u>, <u>e</u>.<u>g</u>., https://www.exchange-rates.org/exchange-rate-
history/inr-usd-2021 (last visited this date).

        [21]    <u>See</u> Megaa Moda SQR at Exhibit S1-8 (complete sales
documentation for sample sale SEQH 76); <u>see</u> <u>also</u> AHSTAC Comments on
IQR at 9 ([[
    ]]).

Consol. Court No. 23-00202    <u>PUBLIC VERSION</u>    Page 35

As mentioned, ITA relies on <u>ZASF I</u> in its IDM to dispose of AHSTAC's main arguments.  That case presented the question of whether the relevant statutes permitted ITA to employ "constructed value" as the basis for normal value when ITA rejects Vietnam, a "third-country nonmarket economy"[22], as the embodiment of "representative" sales values for purposes of 19 U.S.C. §1677b(a)(1)(B)(ii)(I).  In AHSTAC's rebuttal to ZASF's claim of Vietnam as a viable alternative to ZASF's non-viable Indian home market sales, AHSTAC noted that "the overwhelming majority" of ZASF's shipments to Vietnam were to shrimp exporters who were subject to the antidumping duty order on certain frozen warmwater shrimp from Vietnam ("Order") and that the majority of ZASF's shipments were to three companies that are part of a "Group" in Vietnam.  AHSTAC explained that the Group had been subject to the Order, and, in the course of that Group's participation in the investigation, it had reported that it had used imported shrimp as a raw material input in its exports to the United States.  In light thereof, AHSTAC thus argued to ITA that it was likely that ZASF's shrimp shipments to Vietnam are sold or resold through Vietnam and

---

[22] **ITA recently confirmed Vietnam's status as a non-market economy.  <u>See</u> <u>Raw Honey From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Changed Circumstances Review</u>, 89 Fed.Reg. 64411 (Aug. 7, 2024).**

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>    Page 36

shipped to the United States and that the proceeding was thus owed a "more fulsome [<u>sic</u>] and comprehensive explanation" of why ZASF believed that its submitted export documentation was sufficient to prove the "ultimate market" for its shrimp and why ZASF claimed to be "unaware" of any resale or re-shipment of its shrimp from Vietnam to the United States.  <u>ZASF I</u>, 46 CIT at ___, 569 F.Supp.3d at 1345.

Before ITA reached its final results in that case, U.S. Customs and Border Protection ("CBP") undertook an Enforce and Protect Act ("EAPA") proceeding to consider the possibility of circumvention of the antidumping duty order on shrimp from India via Vietnam transhipment.  <u>See</u> <u>generally</u> 19 U.S.C. §1517.  CBP determined that the Group "purchased Indian-origin shrimp for processing and supplemented orders to the United States with Indian-origin shrimp", and that, because Indian origin shrimp are subject to AD duties while Vietnamese-origin shrimp are not, the Group thus "has sufficient reason to disguise the true country of origin of its shrimp or to comingle [<u>sic</u>] Indian-origin shrimp with Vietnamese-origin shrimp and claim only Vietnam as the country of origin":

> Although CBP acknowledged that the . . . Group claims to maintain a "tracing system [which] ensures that imported shrimp never loses its identity as such," it also noted

> the . . . Group's "inability to trace specific imports of
> Indian-origin shrimp through the production facility to
> specific sales," as well as its inadvertent one-time
> export of "commingled Indian-origin and Vietnamese-origin
> shrimp into the customs territory of the United States."
> . . .. Ultimately, because specific orders of imported
> shrimp could not be traced to specific orders of exported
> shrimp, CBP concluded that the . . . Group had failed to
> cooperate to the best of its abilities with the EAPA
> investigation, and applied adverse inferences to reach a
> finding of evasion.

ZASF I, 46 CIT at ___, 569 F.Supp.3d at 1345-46 (citations

omitted). In the end, ITA agreed with AHSTAC that questions

remained unanswered, resulting in its rejection of ZASF's claim

that its Vietnamese sales were "representative". See id., 46 CIT

at ___, 569 F.Supp.3d at 1346.

However, ZASF challenged that rejection, and it prevailed

upon this Court's conclusion that "[n]either [ITA]'s initial

assessment of the record evidence nor its subsequent analysis of

CBP's EAPA determination of evasion by ZASF's primary Vietnamese

purchaser provide a rational basis for its conclusion that ZASF's

Vietnamese sales were unrepresentative and thus unsuitable as a

third country benchmark." Id., 46 CIT at ___, 569 F.Supp.3d at

1353.

Here, ITA relies on ZASF I to deny AHSTAC's claim

regarding the contested sales. See IDM at 9 ("The CIT has held

that the trade patterns of a company's customers do not provide an adequate basis for establishing that sales to such customers are not representative") & n.9.   That interpretation, as applied in this instance, is unduly restrictive.

The facts of ZASF I, seemingly complex, essentially reduce to a lack of substantial evidence to support the conclusions ITA drew in determining that ZASF's third country sales to Vietnam were unrepresentative[23] and thus justified resort to constructed value in the calculation of normal value.   ZASF I, 46 CIT at ___, 569 F.Supp.3d at 1353.   In a nutshell: the Court deemed the claim AHSTAC raised in that case too tenuous for ITA to have pursued. But, the main point for purposes of the matter at bar is that ZASF I reiterated that ITA looks to whether a producer "knew or should have known that the merchandise was . . . for home consumption" in determining the universe of sales that should be included in the home market database.   Id., 46 CIT at ___, 569 F.Supp.3d at 1352 (citation omitted).   And, if the record contradicts imputing knowledge that merchandise was for home consumption, obviously ITA

---

[23]   See 19 U.S.C. §1677b(a)(1)(B)(ii)(I).

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 39

may not suppose that the merchandise was in fact sold for home consumption.[24]

Be that as it may, regardless of the outcome of <u>ZASF I</u>, its facts regarding "trade practices" do not readily extrapolate to curtail ITA's consideration of other independent facts in other instances that may bear on ITA's knowledge test, such as those at bar.[25] The general rule remains that ITA must diligently examine the circumstances surrounding a transaction, when questions arise, in order to determine whether the respondent knew or should have known that the sale is for consumption in the exporting country and can be used to determine normal value.  See <u>INA Walzlager Schaeffler KG v. United States</u>, 21 CIT 110, 122-25, 957 F.Supp. 251, 263-64 (1997) ("<u>INA Walzlager</u>"); <u>Yue Pak, Ltd. v. United States ITA</u>, 20 CIT 495, 498 (1996), <u>aff'd</u>, 111 F.3d 142 (Fed.Cir. 1997); <u>Stupp Corp. v. United States</u>, 43 CIT ___, ___, 359 F.Supp.3d 1293, 1310 (2019) (citations omitted), <u>aff'd in part</u>, <u>vacated in part</u>, <u>remanded on other grounds</u>, 5 F.4th 1341 (Fed.Cir. 2021).

---

[24] It is well-settled that mere speculation does not amount to substantial evidence.  <u>See</u>, <u>e.g.</u>, <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1327 (Fed.Cir. 2009).

[25] For example, ITA implies that the case tied its hands because it limited its ability to consider "trade practices" in assessing a petitioner's questioning of particular sales transactions.

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>    Page 40

All in all, considering the matter at bar, the way in which ITA probed whether Megaa Moda knew or should have known whether the contested sales were "for consumption" in India (or "for export", for that matter) leaves a record inconclusive as to whether the contested sales are properly considered part of normal value, for the following reasons:

> • The unusual nature of the contested sales as compared with Megaa Moda's other home market sales merited greater scrutiny of them in their own right, regardless of the concerns AHSTAC raised with respect towards them.

> • ITA's mere reliance on the fact that the "destination" of the contested sales "was a location in India" ignores the points AHSTAC made with respect to that location; namely, the fact that it corresponds to a location where [[

]]. <u>See</u> AHSTAC Comments on IQR at 11-12. In <u>INA Walzlager</u>, this Court held that ITA reasonably excluded sales from the respondent's home market database even in the absence of evidence showing that the respondent knew the "actual destination of the merchandise." <u>INA Walzlager</u>, 21 CIT at 124-25, 957 F.Supp. at 264-65.

> • Contrary to defendant's claim that [[          ]] "was not a unique characteristic," Def's Resp. at 17, the [[          ]] of the contested sales were unique and [[                    ]] home market sale made during the 12-month period of review. The available evidence in this regard therefore does not suggest a rational "likelihood" that the [[                    ]] contested sales were "for consumption" in the Indian market, particularly when compared against Megaa Moda's other domestic market sales and when comparing Megaa Moda's total domestic sales with the information indicated on the record for [[          ]].

• Megaa Moda's commercial invoices reflect the fact that [[

]].  <u>See</u> Megaa Moda BCQR at Exhibit C.6.b ([[

]]), P.R. 120, C.R. 54. AHSTAC argues that the fact that Megaa Moda did not [[          ]] on the contested sales refutes Megaa Moda's claim that their commercial documents fail to provide any reason for Megaa Moda to know that these sales would not be consumed in India.  AHSTAC Reply at 12, referencing Megaa Moda 56.2 Br. at 10.

• However, the court notes that the opposite could be true as well (<u>i.e.</u>,that Megaa Moda could be correct regarding unbranded products as being exempt from [[  ]]).  Still, ITA cites to no factual information on the record that supports Megaa Moda's claim that [[    ]] apply only to certain types of shrimp product and are inapplicable to the unbranded shrimp sold to [[          ]],[26] as there is no document of record to answer that question, only Megaa Moda's uncorroborated statement.  <u>Cf</u>. <u>Lined Paper from India</u>, <u>supra</u>, I&D Memo at Comment 1 (ITA's "general practice in conducting the 'knowledge test' is to consider documentary or physical evidence that the producer knew or should have known at the time of sale, because this type of evidence is more probative, reliable and verifiable than unsubstantiated statements or declarations").

• In addition, AHSTAC argues that "the fact that the shrimp sold to [[          ]] was unbranded, coupled with the fact that [[

]], refutes ITA's claim that there was 'no evidence' that Megaa Moda's sales were not for consumption in India."  AHSTAC Reply at 12.  AHSTAC claims that unbranded shrimp cannot be sold "for

---

[26]  Instead, the defendant simply accepts the assertion that Megaa Moda, for the first time, made in its rebuttal brief that "unbranded shrimp in India is exempted . . . by law" from [[    ]]. <u>See</u> Megaa Moda Rebuttal Brief at R-3, P.R. 188, C.R. 124.

consumption" in India but "would need to undergo repackaging before being sold for consumption". Id. There is no discussion in the IDM of whether that is the case, but it is a point that needs to be addressed on remand.[27]

At this point, however, the court can neither re-weigh the evidence before ITA, see Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1376–77 (Fed.Cir. 2015), nor sustain ITA's determination on grounds other than as it articulates, see SEC v. Chenery Corp., 332 U.S. 194, 196–97 (1947)("in dealing with a determination or judgment which an administrative agency alone is authorized to make, [a reviewing court] must judge the propriety of such action solely by the grounds invoked by the agency"). While the court can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp. Inc. v. Arkansas–Best Freight System, 419 U.S. 281, 286 (1974), that is not the case here: "the agency must examine the relevant data and

---

[27] In passing, the court also notes that when the question as to the contested sales first arose later in the proceeding, due to the fact that [[

]], if ITA had simply asked and received an honest answer from [[      ]] as to the disposition of the contested sales -- either for export or for domestic consumption -- that might have avoided this kerfuffle entirely. As mentioned, "[t]o the extent that [ITA] finds relevant information missing from the record, it is incumbent on [ITA] to solicit that information from the party in possession of the information". Nucor Corp. v. United States, 47 CIT ___, ___, 653 F.Supp.3d 1295, 1310 (2023) (citation omitted).

Consol. Court No. 23-00202      <u>PUBLIC VERSION</u>                    Page 43

articulate a satisfactory explanation for its action" on its own,
without any attempt by a court upon review to "make up for [any]
deficiencies." <u>Motor Vehicle Mfrs. Assn. of U.S. v. State Farm
Mutual Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

     The matter will therefore be remanded to ITA for further
proceedings consistent with this opinion.


                                    IV

     In the <u>Final Results</u>, ITA denied Megaa Moda's requested
"interest subvention program" offset.    IDM at 14.    Megaa Moda
claims the decision was unlawful as it deprived its financial
expenses of offsetting the entire amount of so-called "short term
capital interest" that it received.    <u>See</u> Complaint, Court No. 23-
00205, ¶¶ 17-23.    Its Rule 56.2 brief characterizes subvention not
as "earned" interest but as "refunds of interest expenses that
stemmed from the company's working capital."    Megaa Moda 56.2 Br.
at 9; <u>see</u> <u>generally</u> <u>id</u>. at 7-14.


                                    A

     Megaa Moda argues that ITA's decision was arbitrary and
an abuse of discretion, resulting in a determination unsupported by
substantial evidence and contrary to more than 30 years of ITA
reliance on short-term interest offsets to calculate the proper

amount of net interest expenses.   Megaa Moda contends that an assessment of the law and the administrative record in this case demonstrates that ITA's actions and conclusions in this matter cannot be sustained.

According to Megaa Moda, ITA unlawfully deviated from both 19 U.S.C. §1677b(b)(3)(B) and 19 U.S.C. §1677b(e)(2)(A).

19 U.S.C. §1677b(b)(3)(B) provides that, in calculating a respondent's cost of production for determining sales at less than the cost of production, that cost shall include "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question" (emphasis added).   19 U.S.C. §1677b(e)(2)(A) provides that, when ITA resorts to constructed value, such value of the imported merchandise is to be an amount equal to the sum including "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country" (emphasis added).   Both statutes define the proper cost of production and constructed value

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 45

to include an amount for selling, general, and administrative expenses based on actual data pertaining to a respondent's production and sales of the merchandise under consideration.

ITA's interpretation of these provisions treats "net interest expenses as a component of general and administrative expenses." <u>See</u> <u>Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada</u>, 67 Fed.Reg. 15539 (Dep't Commerce April 2, 2002), and accompanying I&D Memo at Comment 15. The interpretation is a "long-maintained ITA practice of calculating net interest expenses that allows an offset for short-term interest income when a respondent demonstrates that the short-term income was generated from its manufacturing and selling operations." <u>See</u> <u>Final Determination of Sales at Less Than Fair Value: Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea</u>, 55 Fed.Reg. 32659, 32667 (Dep't Commerce Aug. 10, 1990) (total interest expense reduced by portion attributed to investment activity; short-term investments related to company's current operations offset against remaining interest income)[28]. Ostensibly, the practice is based on recognizing that

---

[28] <u>See</u>, <u>e</u>.g., <u>Chlorinated Isocyanurates From Spain: Notice of Final Determination of Sales at Less Than Fair Value</u>, 70 Fed.Reg. 24506 (Dep't Commerce May 10, 2005), and accompanying I&D

(continued...)

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 46

companies require a certain amount of working capital to conduct
normal production activities and to meet daily payment requirements
like material purchases and payroll.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Notice of Final</u>
<u>Determination of Sales at Less Than Fair Value: Live Swine From</u>
<u>Canada</u>, 70 Fed.Reg. 12181 (Dep't Commerce March 11, 2005), and
accompanying I&D Memo at Comment 2.

To determine whether to allow or deny this requested
offset, ITA "applied its practice" on offsetting financial expenses
with short-term interest income if the record supports it.  IDM at
14.  The defendant argues that ITA's practice allows interest
income earned on working capital to offset expenses in the
financial expenses calculation included in the cost of production.
IDM at 14.  ITA assumes that working capital interest income

---

[28]  (...continued)
Memo at Comment 10 (citation omitted):

> [I]t is the Department's longstanding practice to offset
> interest expense by short-term interest income generated
> from a company's working capital.  In calculating a
> company's cost of financing, we recognize that, in order
> to maintain its operations and business activities, a
> company must maintain a working capital reserve to meet
> its daily cash requirements (<u>e</u>.<u>g</u>., payroll, suppliers,
> etc.).  The Department further recognizes that companies
> normally maintain this working capital reserve in
> interest-bearing accounts.  The Department, therefore,
> allows a company to offset its financial expenses with
> the short-term interest income earned on these working
> capital accounts[.]

derives from the interest on short-term interest-bearing assets. See id., citing Certain Frozen Warmwater Shrimp from Thailand, 74 Fed.Reg. 47551 (Dep't Commerce Sept. 16, 2009) (final admin. review). Accordingly, because short-term interest-bearing assets are presumed to be in a company's current operations account and thus readily available for day-to-day cash requirements, a respondent may use the interest income earned on a short-term interest-bearing asset to offset financial expenses. Id. This practice has been repeatedly affirmed both by this Court and the Federal Circuit. See, e.g., Pakfood Pub. Co. Ltd. v. United States, 453 F.App'x 986, 989-90 (Fed.Cir. 2011) (unpublished); Pakfood Pub. Co. Ltd. v. United States, 34 CIT 1122, 1148-53, 724 F.Supp.2d 1327, 1353-58 (2010); Hyundai Elecs. Indus. Co., Ltd. v. United States, 28 CIT 517, 539-40, 342 F.Supp.2d 1141, 1161-62 (2004); Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 350-51, 966 F.Supp. 1230, 1239-40 (1997); NTN Bearing Corp. of America v. United States, 19 CIT 1221, 1236-37, 905 F.Supp. 1083, 1096-97 (1995).

        The burden of proof is on "the respondent to substantiate and document the nature of accounts when making a claim for an offset, and [ITA] will not allow an offset when a respondent cannot demonstrate that the interest income in question is short-term in

Consol. Court No. 23-00202    PUBLIC VERSION    Page 48

nature." <u>Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. v. United States</u>, 47 CIT ___, ___, 651 F.Supp.3d 1348, 1364 (2023).

Although Megaa Moda agrees with this description of ITA's practice, its Rule 56.2 brief contends that ITA's determination in this review is inconsistent with its well-established practice. Megaa Moda 56.2 Br. at 8-12. It maintains that ITA is mistaken to think that the interest subvention was not generated from Megaa Moda's working capital accounts, characterizing the subvention income as relating to the refund of interest expenses that have been paid on certain export-financing loans, <u>id</u>. at 9-10, and it spends much of its brief identifying various places in the record and asserting that the information identified demonstrates the short-term nature of the income earned from the interest subvention program. <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at 9 (website screenshot explaining loans); <u>id</u>. at 10 (regulations governing subvention program). Megaa Moda also attaches various record excerpts that ITA has already considered and relied upon in deciding to deny the interest subvention income offset in the underlying administrative decision. <u>Id</u>. at 11-12.

The defendant's response is that Megaa Moda's argument "fundamentally misunderstands" ITA's analysis of what constitutes

short-term interest income.  Def's Resp. at 28.  The defendant

highlights ITA's explanation in the Final Results that interest

income is short-term "if generated from the company's current

assets and working capital accounts."[29]

Megaa Moda argues that the packing credit loans were part

of its working capital.  See Megaa Moda 56.2 Br. at 9 ("packing

credit can also be extended as working capital assistance to meet

expenses such as wages, utility payments, travel, expenses, etc.").

Megaa Moda argues further that the interest payments it made on

those loans constituted interest expenses.  Id.  Finally, Megaa

Moda argues that refunds it received for some of its interest

payments on those loans constituted short-term interest income.

Id. at 9-10.

---

[29] IDM at 14.  In Section D of the initial questionnaire,
Megaa Moda was instructed:

> In calculating net interest expense for {cost of
> production} and {constructed value}, include interest
> expense relating to both long- and short-term borrowings
> made by your company. Reduce the amount of interest
> expense incurred by any interest income earned by your
> company on short-term investments of its working capital.
> Demonstrate the short-term nature of the short-term
> interest.

Megaa Moda DQR at D-41.

Responding, the defendant contends that Megaa Moda's arguments fail when viewed in light of ITA's analysis. For example, the packing credit loans are not generating income for Megaa Moda; they are a liability. Id. at 10 ("interest expenses paid on the short-term packing credit loans"). The defendant argues Megaa Moda is simply receiving refunds for what is essentially an overpayment of the interest owed. Id. ("some of those interest expenses were refunded"). Despite Megaa Moda's statement that "it is axiomatic that such subvention necessarily also related to [Megaa Moda's] working capital and also were short-term in nature," id., its own explanation of the subvention program cuts against its erroneous notion that interest payment refunds are related to any short-term investment of its working capital, id., and supports ITA's determination to deny the subvention offset. See IDM at 13-14.

Nor does the "time limitation" for realization of export proceeds substantiate the short-term nature of the loans and interest subvention received. See Megaa Moda 56.2 Br. at 10. Even if those loans are quick to be settled, as Megaa Moda argues, the funds to pay the interest are committed; therefore, the funds cannot be used to meet the company's daily cash-flow requirements. As explained above, interest income is short term in nature only if

Consol. Court No. 23-00202    <u>PUBLIC VERSION</u>    Page 51

the underlying asset (in this case, the interest payments) is liquid enough to meet the company's daily cashflow requirements. <u>Apex Exps. v. United States</u>, 37 CIT 1823, 1828-29 (2013); IDM at 14. ITA "determine{d} that this interest subvention was generated from the refund of interest expenses from export credit, not from the company's current assets and working capital accounts." IDM at 14. In essence, Megaa Moda is attempting to treat borrowed money, in the form of packing loans, the same as if that money were its own, and then Megaa Moda argues that because it has overpaid its interest payments, that the loan has somehow generated money for Megaa Moda. <u>See</u> <u>id</u>.

Lastly, Megaa Moda's reliance on the several attachments appended to its brief is similarly not compelling because ITA has already examined that information and determined in the <u>Final Results</u> that it was unconvincing. <u>See</u> <u>id</u>. For example, attachments 1 and 2 identify and itemize Megaa Moda's interest expenses on "short-term borrowings" while Megaa Moda highlights the line item for the subvention program. Megaa Moda 56.2 Br. at 11; <u>see also</u> Megaa Moda's Revised Case Br. at Att. 2; Megaa Moda Supp. ABCQR at Exhibit S1-1. Attachments 3 and 4 identify and itemize Megaa Moda's total short-term borrowings while Megaa Moda highlights the line item for the packaging credit loans. Megaa

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                     Page 52

Moda 56.2 Br. at 11; <u>see</u> <u>also</u> Megaa Moda's Revised Case Br. at Att.
4; Megaa Moda's Supp. ABCQR at Exhibit S1-1.

        In any event, the only facts these attachments
demonstrate is Megaa Moda's incurred short term liabilities,
interest paid, and interest refunded.  <u>See</u> Megaa Moda 56.2 Br. at
11.  In Section D of the initial questionnaire, ITA instructed
respondents to "reduce the amount of interest expense incurred by
any interest income earned by your company on short-term
investments of its working capital."  Initial Questionnaire at
D-15.  Those attachments do not demonstrate that the loans were
invested or somehow generated interest income; they are only
excerpts of record evidence that ITA has already considered in its
determination to deny the interest subvention offset.  IDM at 14.
The refunds that Megaa Moda received may be related to the packing
credit loans, but not necessarily in the manner for ITA to lawfully
grant a short-term interest income offset, <u>i</u>.<u>e</u>., the refunds were
not generated by Megaa Moda's assets or investments of its working
capital.  <u>See</u> <u>id</u>.

        Finally, Megaa Moda cannot argue, given the record, that
it should be entitled to a short-term interest income offset for
the interest subvention program because it has not demonstrated

that it has "earned" any "short-term" interest income from that program.  Id.  In denying the requested offset, ITA appropriately found that the interest subvention was generated from the refund of interest expenses from export credit, not from the company's current assets and working capital accounts.  Id.  Thus, following its well-established practice, ITA denied the offset, and this determination is supported by substantial evidence.  See id.; Jiangsu, 46 CIT at ___, 651 F.Supp.3d at 1364.

## B

ITA also claims it reasonably excluded Megaa Moda's claimed "interest on FD with FBL" interest income offset.  IDM at 14.  ITA found that Megaa Moda did not satisfy its burden of proof to demonstrate the short-term nature of the interest income, and thus could not substantiate its request for an offset.  Id.; see also Jiangsu, 46 CIT at ___, 651 F.Supp.3d at 1364.  The defendant also notes that nowhere in Megaa Moda's reporting is "FD with FBL" even defined.  See generally Megaa Moda AQR, P.R. 115-117, C.R. 36-40; Megaa Moda BCQR, P.R. 118-127, C.R. 52-58; Megaa Moda DQR, P.R. 129-31, C.R. 63-66); Megaa Moda Supp. ABCQR, P.R. 149-50, C.R. 82-86; Megaa Moda SDQR, P.R. 153-55, C.R. 90-94.

ITA determined in the <u>Preliminary Results</u> and continued to determine in the <u>Final Results</u> that Megaa Moda failed to fulfill its evidentiary burden to demonstrate the short-term nature of the income "interest on FD with FBL" because it did not provide supporting documentation after being specifically asked.  <u>See</u> PDM at 13; IDM at 14.  Megaa Moda challenges this determination and its challenge is two-fold.  First, Megaa Moda claims that the administrative record "already fully supported the treatment of Megaa Moda's interest income on FD with FBL as short-term in nature."  Megaa Moda 56.2 Br. at 13.  Second, it argues that ITA's practice militates toward finding that the income "interest on FD with FBL" is short-term in nature.  <u>Id</u>. at 13-14.

As ITA explained in the <u>Final Results</u>, it specifically asked Megaa Moda to demonstrate the short-term nature of the interest income offset.  Supp. DQ at 8, P.R. 140, C.R. 76.  However, Megaa Moda did not define "interest on FD with FBL" or provide supporting documentation.  <u>See</u> Megaa Moda SDQR at SD1-21, P.R. 153, C.R. 90.  Nor does Megaa Moda explain what "interest on FD with FBL" stands for in its initial brief to this court.  <u>See</u> <u>generally</u> Megaa Moda 56.2 Br.  ITA determined that Megaa Moda did not fully substantiate the interest income offset, as ITA had requested.  IDM at 14.

In addition, Megaa Moda's cite to <u>Glycine from India</u> does not support its claim. Megaa Moda 56.2 Br. at 14, citing <u>Glycine from India</u>, 84 Fed.Reg. 18487 (Dep't Commerce May 1, 2019) (final LTFV determ.), and accompanying I&D Memo at Comment 3. In that case, the respondent classified fixed deposits and value-added tax payments, that generated interest income, as "cash and cash equivalents," and, in doing so, the respondent fully substantiated its requested short term interest income offset. Although Megaa Moda argues that "the same situation existed, and that it was lawfully incorrect for ITA not to have adopted the same approach in this case and treat the interest income on FD with FBL as an appropriate offset to financial expenses," <u>id</u>., Megaa Moda glosses over that none of its submissions at the administrative stages nor the attachments to its brief define "interest on FD with FBL," let alone provide supporting documentation for it. ITA, therefore, argues that it reasonably denied Megaa Moda's requested interest income offset for "interest on FD with FBL." <u>See</u> IDM at 14.

In its reply brief, however, Megaa Moda appears to argue that it should have been obvious that "FD" means fixed deposit and that repeated references to "FBL" in its papers is further-obvious shorthand for the banking institution holding that deposit. Megaa Moda Reply at 9-16. That argument is belated. It is also not

obvious what the tenure of that deposit is (i.e., even if "FD" is construed as a fixed deposit, it is not obvious that such an account was a "ready" source of working capital).  As the party making a claim and in possession of information needed to support the claim, Megaa Moda was responsible for demonstrating the short-term nature of the interest income offset.  In this instance, ITA found that it failed to do so.  See IDM at 14; see also QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1324 (Fed.Cir. 2011) (holding that parties, not ITA, have the burden of building the record); Jiangsu, 46 CIT at ___, 651 F.Supp.3d at 1364.

Nonetheless, because this matter is being remanded for reconsideration of AHSTAC's claim with respect to Megaa Moda's normal value, ITA retains the authority, of course, to revisit Megaa Moda's short-term interest claim of "FD with FBL" on remand, should it chose to do so.  See, e.g., ABB, Inc. v. United States, 41 CIT ___, ___ n.14, 273 F.Supp.3d 1186, 1199 n.14 (2017), aff'd, 920 F.3d 811 (Fed.Cir. 2019); Laclede Steel Co. v. United States, 19 CIT 1076, 1078 (1995).

V

Lastly, AHSTAC argues that because ITA allegedly "erred in determining Megaa Moda's weighted-average dumping margin, the

Consol. Court No. 23-00202    <u>PUBLIC</u> <u>VERSION</u>                Page 57

margin assigned to the non-selected companies under review also requires revision as this margin was determined, in part, on the margin calculated for Megaa Moda." AHSTAC Br. at 23.

Since the defendant agrees that ITA would be statutorily obligated to recalculate the rate assigned to companies not selected for individual review if it were required to calculate a new rate for Megaa Moda, 19 U.S.C. §1677b(a), <u>see</u> Def's Resp. at 33, this issue will be remanded as well.

VI

In accordance with the foregoing, the <u>Final Results</u> must be, and hereby are, remanded to the International Trade Administration, U.S. Department of Commerce, for further proceedings not inconsistent with this opinion.

Results of remand shall be due November 15, 2024. Upon the filing of such results, the parties shall confer and submit a proposed scheduling order for comments, if any, on them 14 days thereafter.

So ordered.

Dated:    New York, New York
          August 15, 2024

                                    /s/ Thomas J. Aquilino, Jr.
                                        Senior Judge